# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY PRIDE, MARVIN RODDY, VICTOR LEE, GARY HARRIS, AND CHRIS ANDERSON, individually and on behalf of All Others Similarly Situated,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>FARM SERVICE AGENCY,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>THOMAS J. VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>*and*<br><br>ZACH DUCHENEAUX, in his official capacity as the Administrator of the Farm Service Agency,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>    *Defendants*. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

JURISDICTION ............................................................................................................... 4

VENUE ............................................................................................................................ 4

PARTIES ......................................................................................................................... 4

FACTUAL ALLEGATIONS ........................................................................................... 6

    A.    The USDA's Direct Loan Program ................................................... 6

    B.    The USDA's Longstanding History of Discrimination ........................ 9

    C.    The USDA's Recent Admissions of Discrimination ........................... 18

    D.    Evidence of the USDA's Recent and Ongoing Discrimination ............... 28

    E.    The USDA's Market Facilitation Program ("MFP") .......................... 33

    F.    Plaintiffs' Experiences Further Confirm Ongoing, Systemic Discrimination ............ 40

CLASS ALLEGATIONS ................................................................................................. 43

COUNT I – VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT .................... 48

COUNT II – EQUAL PROTECTION VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION ................................... 51

COUNT III – DECLARATORY JUDGMENT ............................................................. 52

PRAYER FOR RELIEF ................................................................................................. 53

## INTRODUCTION

1.     The shameful history of the systematic subordination of Black farmers and ranchers predates our nation's founding, with chronic, systemic inequities perpetuated throughout amendment of the Constitution, Reconstruction, federal administration of agricultural policy, civil rights legislation, prior efforts to obtain remedy in the courts, and the best-stated intentions of government reformers. This class action lawsuit is necessary because—however unimaginable and unconscionable this reality might be—that discrimination continues today within our own federal government—in particular, within Defendants the United States Department of Agriculture ("USDA") and the Farm Service Agency ("FSA").[1] This must end.

2.     Seeking to represent a class of similarly situated Black farmers[2] who have been harmed by Defendants' continuing pattern of discriminatory lending practices and exclusion from critical subsidies, Plaintiffs challenge ongoing, pervasive, and systemic discrimination by the very federal agencies that determine the rules of the game and that are supposed to provide a level playing field for American farmers. By continuing decades of discriminatory policies and practices, Defendants have steadily relegated Black farmers to the margins of American agriculture, throttled their efforts to turn sweat equity into profitable returns, and continued to drive countless Black farmers out of business and into financial ruin.

3.     Agricultural lending is the indispensable fuel of the farm economy. Year in and year out, farmers depend on adequate, fair, and timely loans to buy seed, fertilizer, herbicide, and energy to capitalize on planting seasons. Lending is also crucial to farmers' ability to establish and expand their operations by making investments in land, equipment, and other efficiencies that drive

---

[1] Unless otherwise specified, the use of the term "USDA" herein includes all four Defendants named in this action.
[2] Unless otherwise specified, the use of the term "farmers" herein includes both farmers and ranchers.

revenues. Likewise, ranchers depend on adequate, fair, and timely loans to buy livestock and feed, as well as land, fencing, and equipment. Adequate and equitable access to lending often determines the profitability, efficiency, and scale of farming and ranching operations.

4.     Year after year, however, the USDA perpetuates policies and practices in its lending program that subject Black farmers to disparate and discriminatory treatment. The USDA knows that these policies and practices have long disadvantaged Black farmers by every metric—unjustified denials, coerced withdrawals, undue delays, and onerous terms—yet the agency continues the same policies and practices, leaving Black farmers at a significant competitive disadvantage. Among other policies and practices that Defendants know harm Black farmers, the USDA has continued to deliberately place the fate of Black farmers in the hands of local officials, who regularly use delegated powers to apply subjective criteria to discriminatory effects. When decades of such deliberate delegation continue to produce abjectly disparate results, continued delegation is undue, entrenches systemic racism, and cannot be distinguished in impact from a policy of overt discrimination.

5.     Even as agency officials openly admit the USDA's long history of discrimination, the lending data demonstrate that discrimination is anything but a relic of the past. The numbers are stark and show that Black farmers are significantly more likely to be subjected to denials and other obstructions when seeking direct loans. And incredibly, the data show that the problem has gotten worse. As Defendants offer rhetorical pronouncements about racial equity, the only real change in the USDA's direct loan program has been a marked *increase* in the disparate treatment of Black farmers while they continue to lose ground, disproportionately shrinking in size and profitability. Backed by the USDA's own admission, many Black farmers have become so discouraged that they have given up on seeking funds from the USDA. Some have given up on

farming altogether. Yet despite these data, the USDA still fails to implement meaningful change.

6.     Discrimination in Defendants' direct lending program is compounded by disparate treatment of Black farmers in its subsidy programs. Most significantly, the USDA's Market Facilitation Program ("MFP") somehow managed to find and distribute $23 billion in 2018 and 2019 to compensate farmers for tariffs imposed by China in reaction to U.S. trade policy. Incredibly, the USDA directed 99.5% of those funds to white farmers. "Disparate" does not begin to describe that extraordinary result.

7.     Black farmers have now reached a pivotal point. According to the USDA's own data, in the last one hundred years, the number of Black farmers has plummeted from roughly 925,000 in 1920, representing 14% of all farmers, to fewer than 50,000 today, representing only 1% of all farmers. The USDA has had a significant hand in that massive decline.

8.     In partial recognition of its shameful record, the USDA is currently accepting applications for financial assistance to farmers who experienced racial (and other) discrimination in the USDA's lending programs prior to January 1, 2021. But the USDA itself describes this program as only a "step" in addressing its "past" wrongdoing and makes clear that it will not fully compensate applicants for actual economic losses.[3] Moreover, the program does not address ongoing discrimination that Black farmers have experienced in the last three growing seasons. Enough is enough. Black farmers can no longer wait for piecemeal solutions that fail to recognize either the actual damages they have suffered or the ongoing mistreatment they continue to endure.

9.     Plaintiffs, all Black farmers harmed by the USDA's discriminatory practices, on behalf of themselves and others similarly situated, are entitled to monetary, declaratory, and injunctive relief.

---

[3] Application for Financial Assistance Inflation Reduction Act Section 22007 USDA Discrimination Financial Assistance Program (last updated 7/20/2023) (https://22007apply.gov/).

## JURISDICTION

10.     The Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1691e(f), 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201-2202.

## VENUE

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1391(e) because it is a district in which one or more defendants in this action reside, including the USDA and FSA, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

12.     Plaintiff and proposed class representative Larry Pride, a Black American farmer, resides in Panola County, Mississippi where he has farmed since 1985. Mr. Pride currently owns 600 acres in Mississippi that he uses to produce soybeans, corn, beef cattle, and timber. Mr. Pride has been subjected to the USDA's racially discriminatory practices, including this year.

13.     Plaintiff Marvin Roddy, a Black American farmer, resides in Memphis, Tennessee and operates a farm in Tunica County, Mississippi. Mr. Roddy grew up in a farming family with a father who worked as a foreman on large farm that historically operated as a plantation. In 2020, passionate about returning to farming after his retirement from the Army Corps of Engineers, Mr. Roddy leased 300 acres to cultivate row crops such as soybeans. Mr. Roddy has been subjected to the racially discriminatory practices by the USDA, including discriminatory treatment since 2020.

14.     Plaintiff Victor Lee, a Black American farmer, resides in McGehee, Arkansas where he has farmed since 2015. Mr. Lee has leased and planted as many as 700 acres to produce row crops such as soybeans. The USDA's discriminatory practices have caused Mr. Lee to lose leases, reducing his operation to 80 acres this year. Mr. Lee has been subjected to the racially discriminatory practices by the USDA, including discriminatory treatment this year.

15.     Plaintiff Chris Anderson, a Black American farmer, resides in McGehee, Arkansas where he has farmed since 1990. Mr. Anderson has leased and planted as many as 400 acres to produce row crops such as soybeans, wheat, milo, and corn. Mr. Anderson has been subjected to the racially discriminatory practices by the USDA, including discriminatory treatment this year.

16.     Plaintiff Gary Harris, a Black American farmer, resides in Grady, Arkansas where he has farmed since approximately 2013. Mr. Harris has leased and farmed as many as 3000 acres to produce row crops such as soybeans and corn, and to raise cattle. The USDA's discriminatory practices have caused Mr. Lee to lose leases, reducing his operation to 600 acres this year.

17.     Defendant the United States Department of Agriculture ("USDA") is the United States cabinet department responsible for developing and executing federal policy on farming, agriculture, and food. Defendant USDA resides in Washington, D.C. and regularly conducts business in this District, and through local offices throughout the United States. At all relevant times, the USDA had responsibility for the loan programs and federal funds at issue here.

18.     Defendant the Farm Service Agency ("FSA") is an agency within the USDA that implements agricultural policy, administers credit and loan programs, and manages conservation, commodity, disaster and farm marketing programs through a national network of offices. Defendant FSA resides in Washington, D.C. and regularly conducts business in this District, and through local offices throughout the United States. At all relevant times, the FSA had responsibility for administering the loan programs and distribution of federal funds at issue here.

19.     Defendant Thomas Vilsack is the current Secretary of the USDA and is the federal official responsible for the administration of programs that are the subject of this action, as well as the programs administered by any predecessor. Mr. Vilsack is a defendant in his official capacity.

20.     Defendant Zach Ducheneaux is the Administrator of the FSA and is the federal

official responsible for the administration of loan programs of the FSA that are the subject of this action, as well as the programs administered by any predecessor. Mr. Ducheneaux is a defendant in his official capacity.

## FACTUAL ALLEGATIONS

### A.     The USDA's Direct Loan Program

21.     The USDA administers agricultural lending programs through the FSA, which was established on October 13, 1994.[4] The FSA's stated mission is "equitably serving all farmers, ranchers, and agricultural partners through the delivery of effective, efficient agricultural programs for all Americans."[5] The loan programs that the FSA administers are intended to "provide a safety net for farmers and ranchers temporarily unable to obtain credit, to finance their operations, at reasonable rates and terms."[6]

22.     Most farm loans that the USDA (through the FSA) administers are authorized by the Consolidated Farm and Rural Development Act, as amended (the "CONACT").[7] The objective of these programs "is to provide supervised credit and management assistance to eligible farmers to become owners or operators, or both, of family farms, to continue such operations when credit is not available elsewhere, or to return to normal farming operations after sustaining substantial losses as a result of a designated or declared disaster."[8] The programs are designed "to allow those who participate to transition to private commercial credit or other sources of credit in the shortest

---

[4] *See* Department of Agriculture Reorganization Act of 1994, Pub.L. 103-354, 108 Stat 3178, as amended by the Federal Agriculture Improvement and Reform Act of 1996, Pub.L. 104-127, 110 Stat 888.

[5] USDA Farm Service Agency, History and Mission, https://www.fsa.usda.gov/about-fsa/history-and-mission/index (last visited Aug. 8, 2023)).

[6] 2022 USDA Explanatory Notes – Farm Service Agency, at p. 26-5, https://www.usda.gov/sites/default/files/documents/26FSA2022Notes.pdf.

[7] 7 C.F.R. § 761.1(c) ("progression lending" was changed from "supervised credit" as of March 9, 2022).

[8] *Id.*

period of time practicable….”[9]

23.     The USDA uses direct and guaranteed loan programs to pursue these directives. Direct loans are originated and serviced by FSA staff. Guaranteed loans are originated and serviced by qualified commercial, cooperative, or nonprofit lenders. The intent of direct loan programs is to assist those deemed underserved by credit markets because of cash flow feasibility, security, or creditworthiness concerns, or a lack of available agricultural credit in the applicant's area. The intent of guaranteed programs is to assist farmers who do not meet a lender's underwriting criteria or when lenders lack the liquidity necessary to fund otherwise creditworthy applicants. This action focuses on the FSA's direct loan programs.

24.     The FSA originates and services three principal types of direct loans. The first consists of "ownership" loans, which may be used to acquire or enlarge a farm or ranch, to construct or improve buildings on a farm or ranch, or to help conserve and protect soil and water resources on a farm or ranch.[10]

25.     The second consists of "operating" loans, which may be used for purposes including to make a farm or ranch more profitable; to purchase livestock or equipment; to buy feed, seed, fertilizer, or other supplies; to meet essential farm or ranch operating expenses, including cash rent; to finance land or water development or conservation; or to refinance debt.[11]

26.     The third consists of "emergency" loans, which may be used to assist farmers and ranchers with recovery from crop or livestock losses resulting from quarantines, droughts, floods, or other natural disasters or emergencies.[12]

---

[9] *Id.*

[10] 7 U.S.C. §§ 1923, 1924. *See also generally* 7 U.S.C. §§ 1922-1936c.

[11] 7 U.S.C. § 1942. *See also generally* 7 U.S.C. §§ 1941-1949.

[12] 7 U.S.C. § 1963. *See generally* 7 U.S.C. §§ 1961-1970.

27.     The USDA has special legal obligations with respect to "socially disadvantaged farmer[s] or rancher[s]," defined as members of a "socially disadvantaged group" who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."[13] Among other things, the USDA is obligated by law to "encourage and assist socially disadvantaged farmers and ranchers…in the ownership and operation of farms and ranches through (1) education and training; and (2) equitable participation in all agricultural programs of the [USDA]."[14]

28.     The stated objectives of the USDA loan program include: (1) "to provide supervised credit and management assistance to eligible farmers to become owners or operators, or both, of family farms"; (2) "to continue such operations when credit is not available elsewhere"; and (3) "to allow those who participate to transition to private commercial credit or other sources of credit in the shortest period of time practicable."[15]

29.     It has long been and remains the practice and policy of the USDA to delegate authority and discretion for the administration and implementation of its direct loan program to local agency officials.[16]

30.     In addition to this decentralized administration, the USDA also has a practice and policy of injecting a high degree of subjectivity throughout all stages of the direct loan process: from the loan inquiry stage, and on through the loan application stage, the loan

---

[13] 7 U.S.C. § 2279(a)(5) and (6). *See also* 7 U.S.C. § 2003(e)(1)-(2).

[14] 7 U.S.C. § 2279(b).

[15] 7 C.F.R. § 761.1(c).

[16] *See, e.g.*, 7 C.F.R. § 2.42(a)(28) (the Under Secretary for Farm Production and Conservation delegating authority to the FSA Administrator); 7 C.F.R. § 761.1(a) (the FSA Administrator delegating authority to the Deputy Administrator for Farm Loan Programs); 7 C.F.R. § 761.1(b)(1) (the Deputy Administrator delegating authority to each State Executive Director, who may further redelegate authority to a Farm Loan Chief, Farm Loan Specialist, District Director, Farm Loan Manager, Senior Farm Loan Officer, Farm Loan Officer, Loan Analyst, Loan Resolution Specialist, or Program Technician).

approval/denial/withdrawal stage, and the setting of loan terms and conditions.[17] Among other things, the USDA's criteria for its direct loans intentionally lack quantitative, objective standards and vest local agency loan officers with broad authority and discretion in the loan process. The USDA has perpetuated that subjectivity knowing that it consistently produces discriminatory results year in and year out. As described more fully herein, it is in part through these long-standing policies and practices of decentralized authority and subjective criteria that the USDA has knowingly allowed its rampant discriminatory conduct to proliferate and persist.

### B.    The USDA's Longstanding History of Discrimination

31.    The USDA has known of systemic discrimination in its agricultural lending and aid programs for well over 50 years. Studies, initiatives, and even settlements of previously asserted legal claims have so far failed either to rectify these deeply rooted practices or to fully compensate the agency's victims for the damages and setbacks the agency has caused. Despite being well aware of the problem, the USDA continues to engage in these discriminatory practices yet today.

32.    Systemic discrimination in USDA loan programs has been well documented since at least 1965, when the United States Commission on Civil Rights issued a 141-page report called "Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture".[18] The objective was to study "discriminatory policies, practices, or patterns inherent in the administration of selected programs which result in the denial of Federal benefits to persons because of their race or color."[19] With respect to the provision of loans and technical assistance to Black farmers by the Farmers Home Administration (FmHA, and the precursor to FSA), the Commission found that, as compared to similarly situated white farmers,

---

[17] *See, e.g.*, FSA Handbook, Direct Loan Making For State and County Offices, 3-FLP (Rev. 2).

[18] Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture, A Report of the United States Commission on Civil Rights (1965).

[19] Report of the United States Commission on Civil Rights, at viii.

the FmHA had not given "comparable service" to Black farmers "either in terms of the size of loans, the purposes for which the loans are to be used, or the technical assistance necessary to fully achieve the purposes of such loans."[20]

33.     Looking beyond just the number of loans issued to Black farmers, the Commission reviewed data for ownership, operating, and emergency loans and found that, in every economic class, average loan size to white farmers was "substantially greater" than for Black farmers.[21] Even more stark, for white farmers, average loan size "increased steadily as net worth decreased" – in fact, in the poorest classes, white farmers received loans *five times larger* than in classes of richer white farmers.[22] But for Black farmers, the trend was reversed: average loan size "*dropped sharply as the poorer farmers were reached.*"[23]

34.     In January 1981, the USDA issued a report called "A Time to Choose: Summary Report on the Structure of Agriculture." In it, the USDA observed that government subsidies tended to "disproportionately benefit larger farmers and landowners",[24] and that Black and other minority farmers were "disproportionately represented in the poverty groups".[25] At the same time, the USDA found that there was "little economic rationale" for providing public credit to larger farms[26] and that government subsidies would be "better spent" helping small farmers, and in particular, minorities.[27]

35.     In February 1982, the United States Commission on Civil Rights issued a report

---

[20] Report of the United States Commission on Civil Rights, at 67.

[21] Report of the United States Commission on Civil Rights, at 70.

[22] Report of the United States Commission on Civil Rights, at 71.

[23] Report of the United States Commission on Civil Rights, at 71. (emphasis added).

[24] Bob S. Bergland, Secretary of Agriculture, A Time to Choose: Summary Report on the Structure of Agriculture (Jan. 1981), at 146.

[25] Summary Report on the Structure of Agriculture, at 66.

[26] Summary Report on the Structure of Agriculture, at 123, 150.

[27] Summary Report on the Structure of Agriculture, at 123.

entitled "The Decline of Black Farming in America." The Commission acknowledged the USDA's critical role in providing "immediate assistance so urgently needed" by Black farmers.[28] By providing a source of financing to borrowers who could not obtain credit commercially, the Commission observed, the USDA was reflecting "the social value placed on maintaining a strong and diverse agricultural sector."[29]

36.     However, again reviewing the USDA's farm credit programs, the Commission found that, while these programs could "provide immediate direct assistance to [B]lack farmers to make their farms more viable," the USDA had not given "adequate emphasis or priority" to Black farmers, despite their "disproportionate need," and may have even "hindered" Black farmers from remaining viable in agriculture.[30]

37.     In fact, the Commission catalogued numerous "special difficulties" that Black farmers encountered when attempting to use USDA resources.[31] The report describes a "broad range of discriminatory actions" by the agency, including agency officials subjecting Black farmers to "disrespect, embarrassment, and humiliation."[32] Black farmers reported that the USDA denied them opportunities to submit loan applications, took inordinate time to process loan applications, awarded loans for less than the requested amounts, failed to provide the full amount awarded, accelerated repayment schedules without explanation, and contacted commercial creditors to report that no loans would be made to these farmers.[33] The report concluded that the USDA was issuing loans to Black farmers in proportionally fewer numbers and on worse terms

---

[28] A Report of the United States Commission on Civil Rights, The Decline of Black Farming in America (Feb. 1982), at 71.

[29] The Decline of Black Farming in America, at 76.

[30] The Decline of Black Farming in America, at IV, 178.

[31] The Decline of Black Farming in America, at 84.

[32] *Id.*

[33] The Decline of Black Farming in America, at 84, 134.

than their white counterparts, such that the agency was engaging in "the very kind of racial discrimination that it should be seeking to correct."[34]

38.    In July 1986, in a report called "Black Farmers and Their Farms," the USDA found that "[B]lack-operated farms still remain, on average, abnormally small in terms of acreage and value of agricultural products sold."[35] Indeed, the average Black-operated farm was *less than one-fourth the size* of the national average farm.[36] The report did not endeavor to investigate what factors were causing this disparity.

39.    In February 1997, the USDA published a report called "Civil Rights at the United States Department of Agriculture," in which the agency recognized the "persistent problems" in its treatment of minority farmers.[37] The report found that the USDA had "allowed too many past reports to gather dust and too many recommendations to go unimplemented."[38] The report acknowledged "hundreds of minority and socially disadvantaged customers" who had spoken about "discrimination and mistreatment by county-level employees and advisory boards who administer USDA programs," acknowledging that the problems were neither "new" nor "unknown."[39] The report observed that "[d]espite the fact that discrimination in program delivery and employment has been documented and discussed, it continues to exist to a large degree unabated."[40]

40.    Also in February 1997, the USDA Office of the Inspector General (USDA OIG)

---

[34] The Decline of Black Farming in America, at 179.

[35] Vera J. Banks, U.S.D.A., Rural Development Research Report No. 59, Black Farmers and Their Farms (July 1986), at 17.

[36] Black Farmers and Their Farms, at 18.

[37] Civil Rights at the United States Department of Agriculture, A Report by the Civil Rights Action Team (Feb. 1997), at 57.

[38] *Id.*

[39] Civil Rights at the United States Department of Agriculture, at 2.

[40] *Id.* at 2.

issued two reports about the USDA's treatment of minority farmers and ranchers. In "Report for the Secretary on Civil Rights Issues–Phase I," the Inspector General found a "large backlog" of languishing discrimination complaints against the FSA.[41] In a second report, dated November 2005, called "Minority Participation in Farm Service Agency's Farm Loan Programs–Phase II," the Inspector General found that FSA loan decisions for the previous eight years had disproportionately benefitted nonminority farmers.

41.    On August 28, 1997, farmers and ranchers filed *Pigford v. Glickman*, the first of a series of class-action lawsuits against the USDA alleging that the agency was engaging in racial, ethnic, and gender discrimination in its agricultural programs.[42] On October 9, 1998, the Court certified a class for purposes of determining the USDA's liability.[43] In 1999, the Court approved a Consent Decree settlement the parties submitted, which the Court of Appeals affirmed.[44] Under the settlement (sometimes called *Pigford I*), the USDA declined to admit liability for its discriminatory behavior and agreed to compensate Black farmers only if they demonstrated by "substantial evidence" that they were the victim of race discrimination. Administration of the settlement took many years, encountered numerous problems, and left most of the agency's victims uncompensated, in part because of resistance by the USDA itself.[45]

42.    In 2005, the USDA OIG issued a follow-up report to "revisit the findings" of its

---

[41] Roger C. Viadero, Inspector General, Report for the Secretary on Civil Rights Issues–Phase I (Feb. 27, 1997), at 1.

[42] *Pigford v. Glickman,* Nos. 97-1978, 98-1693 (D.D.C. 1997) was filed on behalf of Black farmers in 1997 and settled in 1999, with an additional settlement (*Pigford II*) in 2010. *Keepseagle v. Glickman,* No. 99-3119 (D.D.C. 1999) was filed on behalf of Native American farmers in 1999 and settled in 2010. *Garcia v. Glickman,* No. 00-2445 (D.D.C. 2000) was filed on behalf of Hispanic farmers in 2000. *Love v. Glickman,* No. 00-2502 (D.D.C. 2000) was filed on behalf of women farmers in 2000. *Garcia* and *Love* were consolidated and settled in 2011.

[43] *Pigford v. Glickman*, 182 F.R.D. 341 (D.D.C. 1998). On January 5, 1999, the Court vacated this order and recertified the class under Fed. R. Civ. P. 23(b)(3). The Court approved a revised definition of the class on April 14, 1999. *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999), *aff'd* 206 F.3d 1212 (D.C. Cir. 2000).

[44] *Pigford v. Glickman*, 206 F.3d 1212, 1219 (D.C. Cir. 2000).

[45] Less than 14% of the 94,000 Black farmers who sought restitution obtained awards. *See* Environmental Working Group, "Obstruction of Justice: USDA Undermines Historic Civil Rights Settlement with Black Farmers" (July 20, 2004).

1997 report, called "Audit Report: Minority Participation in Farm Service Agency's Programs." The USDA OIG continued to find ongoing problems with respect to the USDA's treatment of minorities, including that the agency was still not effectively processing civil rights complaints and was failing to adequately coordinate[46] outreach activities to minority farmers. Indeed, although the USDA OIG found some improvement, the USDA OIG nevertheless found that the USDA was still lagging behind in loan processing times and approval rates as compared to non-minorities. [47]

43.     In particular, the USDA OIG cited minority loan applicants who "were not given the technical assistance needed to complete their application and obtain funds in time to plant their crops and achieve optimum production." In FY2003 in Mississippi, for example, the average time between when loans were approved and when they closed was 61 days for Black farmers and 47 days for white farmers.[48] Moreover, while the USDA OIG highlighted that the number of minority loan applications had increased from FY1996 to FY2003, the same data showed a material *decrease* (from 63% to 56%) in the approval rates of those applications, still lagging behind the approval rates of nonminority farmers in the same areas.[49]

44.     On May 14, 2008, the United States Government Accountability Office ("GAO") issued a report on the agency's processing of civil rights complaints, which is conducted through the Office of the Assistant Secretary for Civil Rights (OASCR).[50] The report described the backlogs of discrimination complaints at the agency and the agency's "difficulties" in simply

---

[46] U.S.D.A., Office of Inspector General, Audit Report: Minority Participation in Farm Service Agency's Programs (Nov. 2005), at i.

[47] Minority Participation in Farm Service Agency's Programs, at 6.

[48] Minority Participation in Farm Service Agency's Programs, at 7.

[49] Minority Participation in Farm Service Agency's Programs, at 9.

[50] United States Government Accountability Office, "U.S. Department of Agriculture: Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention," Testimony before the Subcommittee on Government Management, Organization, and Procurement, Committee on Oversight and Government Reform, House of Representatives, May 14, 2008.

processing those complaints, to the point of questioning the "credibility" of the agency itself:

> At a basic level, the credibility of USDA's efforts to correct long-
> standing problems in resolving discrimination complaints has been
> and continues to be undermined by faulty reporting of data on
> discrimination complaints and disparities we found when comparing
> various [OASCR] sources of data. Even such basic information as
> the number of discrimination complaints is subject to wide variation
> in [OASCR's] reports to the public and the Congress.[51]

The report further described the USDA's data on the participation of minority farmers in USDA

programs as "unreliable, according to USDA."[52]

45.     Due to problems in the administration of the *Pigford* settlement, in 2008 Congress

allowed claimants to re-file their claims in federal court, and the ensuing lawsuits were

consolidated into a single case.[53] On February 18, 2010, the USDA announced a new round of

settlements for these claims, followed by several additional years of additional claims

administration. On May 29, 2013, the Congressional Research Service noted that not a single new

claim had yet been paid.[54] Ultimately, a lower proportion of successful claims was positively

adjudicated than under *Pigford I.*[55] And even these payments only compensated the victims of the

USDA's discrimination in relation to the claims raised in the original *Pigford* lawsuit, which only

covered acts of discrimination that had occurred between 1981 and 1996.

46.     Moreover, the settlements did not cause the agency to correct its discriminatory

ways. On November 5, 2010, for example, Mr. Lloyd Wright, an Advisor to Secretary Vilsack

(who also served as USDA Secretary in President Obama's administration), wrote the Secretary's

---

[51] Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention, at 4.

[52] Management of Civil Rights Efforts Continues to be Deficient Despite Years of Attention, at 4-5.

[53] *See In re Black Farmers Discrimination Litigation*, 1:08-mc-00511-PLF (2008) (sometimes called *Pigford II*).

[54] Congressional Research Service, The *Pigford* Cases: USDA Settlement of Discrimination Suits by Black Farmers (May 29, 2013).

[55] *Id.*

Deputy Chief of Staff reporting on how the FSA was discriminatorily under-recording the crop yields of Black farmers.[56] Not only did this prevent these farmers from receiving farm loans and other federal benefits, but it also impacted their ability to obtain crop insurance payments and disaster relief. According to the memorandum, with respect to disaster relief, "the [B]lack farmer must lose nearly twice as much as the white farmer in order to qualify for the same disaster relief because his recorded crop yield is nearly half that of the white farmer."

47.    On March 31, 2011, the law firm of Jackson Lewis LLP issued a report commissioned by the USDA that, after an 18-month investigation, documented ongoing problems with discrimination at the agency.[57] In its own words, the report "substantiated claims of denial of equal program access and continuing institutional discrimination," starkly observing as follows:

> [T]he vast majority of USDA employees interviewed (in some Agencies, 80-90%) disclaimed knowledge of discriminatory practices or unequal treatment of SDG [socially disadvantaged group] customers or potential customers. Clearly, significant numbers of USDA employees do not accept eradication of barriers to equal access or Agency discrimination as enforceable and important Department-wide priorities. *The very fact that so many USDA employees did not recognize the real problems of inequitable program delivery is a very serious concern, but may explain, in part, why previous efforts to address USDA discrimination problems have been less than fully successful.*[58]

The report found that USDA employees "recognize the inequitable customer service, but do not see it as a problem because 'it has always been done this way' and there is no penalty for continuing to do so."[59] Not surprisingly, then, the data still "clearly indicated some serious failures to meet

---

[56] Informational Memorandum for Deputy Chief of Staff to the Secretary, Lloyd Wright, USDA Advisor to the Secretary, to C. Jett, USDA Deputy Chief of Staff, dated Nov. 5, 2010.

[57] Jackson Lewis LLP, Civil Rights Assessment, Final Report (Mar. 31, 2011), *cited in* USDA Motion for Summary Judgment dated March 11, 2022 (Dkt. 168) at 20.

[58] Civil Rights Assessment, Final Report, at viii (emphasis in original).

[59] Civil Rights Assessment, Final Report, at 62.

the Agency's mandate to provide fair and equitable access to FSA programs and services."[60] The report further catalogued persistent complaints that minority farmers were discriminated against with respect to the availability, timing, and requirements for obtaining USDA loans.[61]

48.     In July 2019, the GAO issued a report acknowledging the ongoing importance of financing to farmers and ranchers, observing that "[a]gricultural producers generally require financing to acquire, maintain, or expand their farms, ranches, or agribusinesses."[62] Nevertheless, the GAO found that, in surveys taken in 2015-2017, socially disadvantaged farmers comprised 17% of primary producers but accounted for only 8% of total agricultural debt. Moreover, while socially disadvantaged farms tended to be smaller in size and revenue than other farms, only 21% received government payments, compared to 36% of non-socially disadvantaged farms.[63]

49.     On February 24, 2021, the GAO released another report, similarly finding "racial and income disparities in access to financial services and availability of credit," with women and minority farmers receiving "less access to credit" than other agricultural businesses.[64] Again, the GAO recognized that while women and minority farmers and ranchers represented about 17% of primary producers, they accounted for only 13% of farms with loans and 8% of outstanding total agricultural debt.[65]

50.     Meanwhile, the USDA's process for addressing civil rights complaints remained sorely lacking, leaving the victims of the USDA's ongoing discrimination without recourse. In

---

[60] Civil Rights Assessment, Final Report, at 66.

[61] Civil Rights Assessment, Final Report, at 77-92.

[62] United States Government Accountability Office, Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers is Limited, (July 2019), at 7.

[63] Id.

[64] United States General Accounting Office, Financial Services: Fair Lending, Access, and Retirement Security, (Feb. 24, 2021).

[65] Financial Services: Fair Lending, Access, and Retirement Security, at 2.

September 2021, the USDA OIG issued an audit report finding that the USDA's Office of the Assistant Secretary for Civil Rights, which was responsible for processing complaints by persons subjected to USDA discrimination, was not "timely and appropriately" handling the complaints it received.[66] Incredibly, the report found that, in 2019, the agency was taking an average of 799 days–well over two years–to process a program complaint (compared to the 180-day standard). Moreover, the USDA OIG found that roughly one-third of the complaint determinations it reviewed "were not adequately supported and processed."[67]

51.     Indeed, reports found that the USDA's complaint process—the purpose of which was to investigate and address the agency's discriminatory conduct—was *itself* discriminatory, to the point that the USDA was foreclosing on farmers attempting to redress discrimination with pending discrimination complaints.[68]

### C.     The USDA's Recent Admissions of Discrimination

52.     The USDA still acknowledges the systemic racial discrimination in connection with its lending programs, which has resulted in past, current, and ongoing adverse effects to minority farmers and ranchers. For reference, the U.S. Equal Employment Opportunity Commission ("EEOC") defines systemic discrimination as a "pattern or practice, policy and/or class cases where the discrimination has a broad impact on an industry, profession, company, or geographic location."[69] The EEOC further recognizes "systemic" as "bias that is built into systems, originating

---

[66] USDA Office of the Inspector General, USDA Oversight of Civil Rights Complaints, Audit Report 60601-0001-21 (Sept. 2021). The problems and deficiencies recognized by the USDA OIG's audit report regarding the USDA's processing of discrimination complaints were not new.

[67] USDA Oversight of Civil Rights Complaints, at 4.

[68] *See* Harvard Law School Food and Law Policy Clinic, Supporting Civil Rights at USDA: Opportunities to Reform the USDA Office of the Assistant Secretary of Civil Rights, (April 2021).

[69] Systematic Enforcement at the EEOC, https://www.eeoc.gov/systemic-enforcement-eeoc (last visited Aug. 8, 2023).

in the way work is organized."[70]

53.     On March 25, 2021, Defendant Vilsack, in his capacity as the Secretary of USDA, testified before Congress regarding the USDA's long-standing "systemic racism and discrimination" against minority farmers.[71] Stating that he was speaking "from the heart," Secretary Vilsack admitted that systemic discrimination still exists at the USDA, and he candidly testified that "more needs to be done to dig deeper into the systemic causes and barriers that perpetuate discriminatory practices, and to deal directly with the cumulative effect of discrimination, the gap that now exists between those who had the full array of services at USDA, the full array of programs at USDA, and those who, for far too long, have not had that array."[72]

54.     The Secretary further acknowledged that "clearly more needs to be done to drive our efforts deeper."[73] Foremost, he continued, the USDA "must redress the discrimination that has proven to be systemic, evidently reflecting the way we have designed or implemented our programs."[74] The Secretary observed that by focusing on whether farmers could prove "specific, individualized discrimination," the USDA had "failed to do the necessary work tailored to addressing the systemic discrimination socially disadvantaged producers face."[75] The "systemic racism and discrimination perpetuated against Black Farmers, and the history of discrimination against Black Farmers by USDA," he continued, "has prevented numerous African-Americans, among other people of color, from fully realizing the same level of prosperity and success as their

---

[70] *Id.*

[71] A Hearing to Review the State of Black Farmers in the U.S., Prepared Opening Statement of Thomas J. Vilsack Before the House Committee on Agriculture (Mar. 25, 2021).

[72] A Hearing to Review the State of Black Farmers in the U.S., at 10-11.

[73] A Hearing to Review the State of Black Farmers in the U.S., at 12.

[74] *Id.*

[75] *Id.*

white counterparts."[76]

55.     The next day, on March 26, 2021, FSA Administrator Zach Ducheneaux further admitted the "systemic discrimination" against minority farmers and ranchers by the USDA:

> USDA recognizes that socially disadvantaged farmers and ranchers have faced systemic discrimination with cumulative effects that have, among other consequences, led to a substantial loss in the number of socially disadvantaged producers, reduced the amount of farmland they control, and contributed to a cycle of debt that was exacerbated during the COVID-19 pandemic.[77]

56.     Also in March 2021, Congress passed the American Rescue Plan Act of 2021 (ARPA, and also called the COVID-19 Stimulus Package), which among other things, appropriated funds to the USDA to provide loan forgiveness and other aid to socially disadvantaged farmers and ranchers. ARPA Section 1005 defined "socially disadvantaged farmer or rancher" in reference to 7 U.S.C. § 2279(a) as a farmer or rancher "who is a member of a socially disadvantaged group," which is further defined as a group "whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."[78] In turn, the USDA identified those groups as American Indians or Alaskan Natives, Asians, Black Americans or African Americans, Hispanics or Latinos, and Native Hawaiians or other Pacific Islanders.[79]

57.     But before the funds could be dispersed, certain white farmers sued in various

---

[76] *Id.*

[77] Zach Ducheneaux, Administrator, Farm Service Agency, American Rescue Plan Socially Disadvantaged Farmer Debt Payments (Mar. 26, 2021), https://www.farmers.gov/blog/american-rescue-plan-socially-disadvantaged-farmer-debt-payments (last visited Aug. 8, 2023).

[78] 7 U.S.C. § 2279(a)(5) and (6).

[79] *See* Notice of Funds Availability; ARPA 2021 § 1005 Loan Payment, 86 Fed. Reg. 28329, 28330 (May 26, 2021). *See also* Outreach & Assistance for Socially Disadvantaged Farmers & Ranchers Program, 66 Fed. Reg. 21617-01 (Apr. 30, 2001); Livestock Indemnity Program & Gen. Provisions for Supplemental Agricultural Disaster Assistance Programs, 74 Fed. Reg. 31567 (July 2, 2009); Conservation Reserve Program; Transition Incentives Program, 75 Fed. Reg. 27165 (May 14, 2010).

jurisdictions claiming that the USDA was improperly excluding *them* from the Section 1005 program. On April 26, 2021, for example, Sid Miller, a white farmer and rancher in Erath, County, Texas, filed a class-action lawsuit against the USDA, alleging that the USDA had engaged in unconstitutional discrimination by excluding white farmers and ranchers from the definition of "socially disadvantaged farmers and ranchers" (hereinafter *Miller v. Vilsack*).[80]

58.     Likewise, on May 18, 2021, Scott Wynn, a white farmer in Jennings, Florida, individually sued Secretary Vilsack and FSA Administrator Ducheneaux, making similar allegations of racial discrimination with respect to the USDA's implementation of Section 1005 (hereinafter *Wynn v. Vilsack*).[81]

59.     On June 4, 2021, in opposition to Mr. Wynn's Motion for Preliminary Injunction in *Wynn v. Vilsack*, the USDA expressly admitted the agency's past and ongoing discrimination against minority farmers in its loan programs. "In fact," the USDA argued, "the evidence indicates…that throughout USDA's history and *up to present day*, minority farmers have been 'hurt' more than helped due to discrimination in USDA's farm loan programs."[82] The USDA argued that "[m]inority farmers have long experienced inequities in FSA's administration of farm loans, including with respect to loan approval rates, amounts, and terms."[83]

60.     In support of its argument, the USDA quoted the Chairman of the House Agriculture Committee, Representative David Scott, stating on February 26, 2021, that "the systemic discrimination against farmers of color by USDA is longstanding and well-documented

---

[80] Plaintiff's Class-Action Complaint at 2, 6 (Apr. 26, 2021), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 1).

[81] Complaint (May 18, 2021) *Wynn v. Vilsack*, No. 21-cv-00514 (M.D. Fla.) (ECF No. 1).

[82] Gov't's Resp. in Opp'n to Pl.'s Mot. for Prelim. Injunction at 4-5 (June 4, 2021), *Wynn v. Vilsack*, No. 21-cv-00514 (M.D. Fla.) (ECF No. 22) (citations omitted) (emphasis added).

[83] *Id*. at 5 (citations omitted).

and continues to present barriers for these producers to participate in the agricultural economy."[84] The USDA argued that its discrimination against minority farmers "was not limited to their inability to obtain USDA loans," but they have "also received smaller loan amounts, had those amounts arbitrarily reduced, were subject to inordinate approval wait times that adversely affected their ability to repay the loans, were denied opportunities to avoid foreclosure, and were often assigned 'supervised' loans that required white loan officers to approve and co-sign every transaction."[85]

61.    Likewise, on July 11, 2021, in opposition to the plaintiff's Motion for Preliminary Injunction in *Miller v. Vilsack*, the USDA again starkly admitted that "the evidence indicates…that throughout USDA's history and *up to the present day*, minority farmers have been 'hurt' more than helped due to discrimination in USDA's farm loan programs."[86] The USDA again cited to and relied on Chairman Scott's statement that "systemic discrimination against…farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy."[87] And the USDA catalogued what it described as "persuasive evidence of lingering discrimination" in its own programs, citing "recent reports" documenting continued discrimination against farmers of color.[88]

62.    On July 1, 2021, the district court granted Mr. Miller's Motion for Class Certification and Mr. Miller's Motion for Preliminary Injunction.[89]

63.    On March 11, 2022, the USDA filed a Motion for Summary Judgment. Arguing

---

[84] *Id.* at 8 (citations, internal quotations, and alterations omitted).

[85] *Id.* at 37.

[86] Gov't's Resp. in Opp'n to Pl.'s Mot. for Prelim. Injunction at 4 (June 11, 2021), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 27).

[87] *Id.* at 16.

[88] *Id.* at 34-35.

[89] Order (July 1, 2021), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 60).

that Section 1005 was justified to "remedy the lingering effects of past discrimination against minority farmers in the administration of USDA loan programs," the USDA described the "evidence" of its own discrimination as follows:

> First, is well documented that FSA itself historically engaged in discriminatory practices with devastating effects on minority farmers. Second, more recent analysis establishes that the effects of that past discrimination persist in the present day, in the form of smaller farms, lower capitalization, higher debt ratios, and greater financial instability, including higher rates of delinquency and foreclosure, for minority farmers. Third, past remedial efforts have failed to address these lingering effects and in some cases only exacerbated them.[90]

The USDA admitted that discrimination had "become ingrained in the agency's problems," citing evidence including the 2011 Jackson Lewis report.[91] The USDA further cited a letter by a group of agriculture scholars for its explanation of how, through its payment programs, the USDA rewards "'the largest farms the most,'" which "has naturally excluded minority farmers and caused them to 'fall further behind.'"[92]

64.    Arguing in support of its Motion for Summary Judgment, the USDA admitted to "clearly identified, well-documented, and repeated discriminatory actions by FSA officials in the administration of USDA's loan programs, not discrimination in society more broadly."[93] The USDA recognized "current statistical disparities" that it claimed "are useful for measuring whether and to what extent minority farmers continue to experience the effects of discrimination in USDA loan programs."[94]

---

[90] Gov't Memo. in Support of Mot. for Summ. J. at 8 (Mar. 11, 2022), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 168).

[91] *Id.* at 20.

[92] *Id.* at 24, *quoting* 167 Cong. Rec. S1266.

[93] *Id.* at 33.

[94] *Id.* at 33.

65.     In further support of its Motion for Summary Judgment, the USDA submitted several reports. The first was a Declaration from William D. Cobb, a 37-year veteran of the USDA currently acting as the Deputy Administrator for Farm Loan Programs, with oversight responsibilities over the FSA's direct and guaranteed lending programs.[95] Among other things, Mr. Cobb opined as follows:

> The USDA has a well-documented history of discrimination against minority farmers and ranchers in the administration of its various Farm Loan Programs. This historical discrimination continues to have observable effects on minority communities.[96]

Mr. Cobb further acknowledged that minority farmers "continue to be underrepresented in certain USDA programs."[97]

66.     The USDA further attached the Expert Report of Dr. Alicia Robb, an economist who had served with federal agencies including the U.S. Small Business Administration, the Federal Reserve, and the U.S. Census Bureau. The USDA retained her to "evaluate the anecdotal and statistical evidence of discrimination against minority farmers in USDA's lending programs" and render an opinion about "whether there are any lingering effects of this past discrimination that disadvantage individual groups of minority farmers in the present day."[98]

67.     After reviewing "numerous" non-governmental and governmental reports, which included audits, census data, loan data, and other information, Dr. Robb found as follows:

> 1)  These materials and data provide substantial evidence of past discrimination against minority farmers in USDA loan programs.

---

[95] Declaration of William D. Cobb (Mar. 11, 2022), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (No. 168-1) at 1.

[96] Declaration of William D. Cobb, at 3.

[97] Declaration of William D. Cobb, at 18.

[98] Expert Report of Alicia M. Robb, Ph.D. (Jan. 7, 2022), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (No. 168-2) at 1.

2) These materials and data reveal large and adverse disparities between minority and non-minority farmers today.

3) These disparities cannot be explained solely by differences between minority and non-minority farmers or other factors untainted by discrimination.

4) Instead, these disparities are consistent with what one would expect given both the well-established historical discrimination in USDA's loan programs and the nature of credit markets and the agricultural sector.[99]

68.    Dr. Robb described how the USDA's discriminatory practices had permeated the entire loan application process:

This discrimination manifested in many ways throughout the loan cycle, including disparate treatment in: 1) outreach and education about existing loan programs and eligibility; 2) assistance with loan applications; 3) processing time for applications; 4) loan application approvals; and 5) post-disbursement loan servicing. In addition, various reports indicated that minority farmers were given additional requirements, such as needing a joint signature of an FSA representative for withdrawing funds for expenses, which were not typically imposed on white farmers. The evidence tells a clear story: For decades, USDA discriminated against minority farmers in numerous ways in administering its loan programs.[100]

69.    Dr. Robb stated that discriminatory conduct could harm a farmer "for decades."[101]

70.    Dr. Robb observed that the "present-day disparities are consistent with the expected effects of the well-documented and systemic historical discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination."[102]

---

[99] *Id.* at 5.

[100] *Id.* at 6-7.

[101] *Id.* at 7.

[102] *Id.* at 8. *See also, id.* at 42 ("These disparities and other lingering effects are consistent with the well-documented and systemic discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination."); *id.* at 82 ("The disparities between minority and non-minority farmers today cannot be explained solely by differences in factors untainted by discrimination. These disparities are instead consistent with what one would expect given historical discrimination against minority farmers

71.     The evidence Dr. Robb cited included "myriad anecdotal accounts" of the USDA

not providing the "same levels of assistance to minority farmers," including:

-   USDA denying minority farmers' loan applications at higher
    rates, arbitrarily, and sometimes without explanation;

-   Minority farmers receiving USDA loans that were smaller, on
    less favorable terms, arriving too late to be useful for that year's
    operations, and/or with additional requirements not imposed on
    white farmers;

-   Minority farmers receiving USDA loans and then having their
    loans arbitrarily reduced; [and]

-   USDA not informing minority farmers of loan servicing options
    or providing the same levels of loan servicing to minority
    farmers[.][103]

72.     Dr. Robb further observed "substantial evidence" that discrimination in USDA loan

programs has caused minority farmers to become "discouraged borrowers" who are "less likely to

seek future USDA assistance precisely because of past USDA discrimination and a resultant lack

of trust."[104] Such borrowers, Dr. Robb observed, "expect unfair treatment by USDA."[105] Looking

at the data, Dr. Robb concluded that there were "large numbers of discouraged borrowers."

73.     Dr. Robb further observed how "other factors are themselves strongly correlated

with other effects of discrimination," explaining:

For instance, many government programs tend to favor large farms,
such as programs for certain crops that are economically feasible
only at large scale. Large farms are disproportionately farmed by
whites, who therefore receive a disproportionate share of the
benefits of those programs. As discussed above, however, the

---

in USDA's loan programs and the nature of agricultural credit markets."); *id.* at 90 ("[T]here are significant disparities between the acreage of minority farms and non-minority farms; between the market value of products sold by minority farmers and non-minority farmers; and between the net income of minority farmers and non-minority farmers. These large disparities, across several relevant metrics, strongly suggest that discrimination in agricultural lending markets, including by USDA, is a primary explanation.").

[103] Expert Report of Alicia M. Robb, Ph.D., at 111.

[104] Expert Report of Alicia M. Robb, Ph.D., at 8, 92.

[105] *Id.* at 92.

smaller size of minority farms in terms of acreage and revenue is likely due in no small part to historical discrimination in USDA loan[106] programs that have deprived minority farmers of necessary credit and services.[107]

74.     Dr. Robb concluded that, according to the economic data, the USDA was still not providing minority farmers adequate access to government funds:

> Given that minority farmers are in an economically disadvantaged position vis-à-vis white farmers, one would expect to see government payments going disproportionately to minority farmers. Instead, we see the opposite. …[I]n 2017, white farmers received nearly all (98.6%) of government payments, while farmers in each of the minority groups received less in government payments than their corresponding share of farms.[108]

75.     On August 29, 2022, with summary judgment motions still pending, the parties in *Miller v. Vilsack* jointly entered a stipulation of dismissal shortly after Congress repealed Section 1005. (Dkt. 236.)[109]

76.     In place of Section 1005, Congress amended ARPA Section 1006 to include financial assistance for farmers or ranchers "determined to have experienced discrimination prior to January 1, 2021," in USDA lending programs, subject to "standards set and enforced by the Secretary."[110] On July 7, 2023, the USDA opened an application process for the Section 22007 financial assistance under a program it calls the Discrimination Farmer Assistance Program ("DFAP"). DFAP defines "discrimination" as "treating some people differently from others, for illegitimate reasons," and includes several examples of the agency's misconduct: "failure to provide appropriate assistance; delay in processing a loan or loan servicing application; denial of

---

[106] Expert Report of Alicia M. Robb, Ph.D., at 92-93.

[107] Expert Report of Alicia M. Robb, Ph.D., at 93.

[108] Expert Report of Alicia M. Robb, Ph.D., at 99.

[109] *See* Inflation Reduction Act § 22008, PL 117-169, Aug. 16, 2022, 136 Stat 1818 (repealing ARPA Section 1005).

[110] *Id.* at § 22007.

a loan or loan servicing; prevention from applying for a loan or loan servicing; adverse loan terms; [and] unduly onerous supervision of loan requirements."[111] DFAP requires applicants to fill out a ten-step application and provide specific evidence of discrimination by USDA in USDA farm lending before January 1, 2021.[112]

77.     DFAP has significant limitations. It is not intended to provide full relief or compensation for the USDA's discriminatory conduct and provides no relief for discrimination that has occurred since January 1, 2021. Thus, Congress expressly declined to address USDA discriminatory actions occurring after January 1, 2021. DFAP did not preclude minority farmers from seeking redress under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), and did not address discrimination in USDA programs besides lending. It also did not adopt any directives or requirements to reform USDA's longstanding discriminatory practices. In sum, DFAP provides yet another clear acknowledgment of the serious harm inflicted on farmers of color by discriminatory practices by the USDA, without fully redressing or fixing the problem.

### D.      Evidence of the USDA's Recent and Ongoing Discrimination

78.     In *Miller v. Vilsack* and similar cases, despite acknowledging and even relying on the volumes of evidence about present-day disparities and systemic discrimination within its loan and aid programs, the USDA was for the most part only willing to acknowledge its discriminatory conduct in terms of the "persistent effects of *past* discrimination."[113] Nevertheless, the arguments

---

[111] Application for Financial Assistance Inflation Reduction Act Section 22007 USDA Discrimination Financial Assistance Program (last updated 7/20/2023), supra note 3, at iii-iv.

[112] *Id.* at ix-x.

[113] *See, e.g.,* Gov't's Memo. in Support of Mot. for Summ. J. at 13 (Mar. 11, 2022), *Miller v. Vilsack*, No. 21-cv-00595-0 (N.D. Tex.) (ECF No. 168). Intervenors including the Federation of Southern Cooperatives, the Land Assistance Fund, the National Black Farmers Association, and the Association of American Indian Farmers attempted to fill that gap by arguing and presenting evidence that the USDA was still discriminating against Black and other minority farmers. *See* Mem. of Law in Supp. of Mot. to Intervene of the Fed'n of S. Cooperatives/Land Assistance Fund (supported by declarations from individual farmers) at 8 (Oct. 12, 2021) *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 93-1) ("The Federation has gathered data on discriminatory practices by local FSA offices

and evidence that the USDA advanced in those cases lead to the inescapable conclusion that this systemic discrimination did not somehow cease to exist at some point in time, but instead is still very much extant and engrained in the USDA's loan and aid programs.

79.      In fact, while the agency's litigation expert, Dr. Alicia Robb, was only asked to assess the "lingering effects of [USDA's] past discrimination," she nevertheless found that state-specific data from 2017 to 2019 showed disparities that were not explainable by race-neutral factors.[114] In particular, the data reflected ongoing disparate impacts, despite showing "no clear delineation" in experience levels between minority and non-minority farmers, and even that minority farmers were "*more* likely to be engaged in farming as a primary occupation than whites."[115] According to Dr. Robb, "[t]he disparities between minority and non-minority farmers today cannot be explained solely by differences in factors untainted by discrimination."[116] In fact, according to Dr. Robb, "the data show disparities—some of them quite significant—that persist today."[117] Nowhere does either Dr. Robb or the USDA ever attempt to assert that at some point in time its discriminatory conduct somehow ceased.

80.      Nor can the USDA point to any institutional change or reform that might be expected to eradicate the policies and practices that foster discrimination by the agency. To the contrary, the USDA's own actions continue to illustrate that discrimination very much remains ongoing in the agency's operations and requires remedial action. For example, on April 14, 2022, the USDA announced an "Equity Action Plan," which purported to commit the USDA to "rooting

---

through countless reports of Black farmers who have had an FSA loan application denied, even if the farmer has significant farming experience, sufficient credit history, and ability to pay back an FSA loan.")

[114] Expert Report of Alicia M. Robb, Ph.D. (Jan. 7, 2022), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (No. 168-2) at 1, 76.

[115] Expert Report of Alicia M. Robb, Ph.D., at 78-80 (emphasis in original).

[116] Expert Report of Alicia M. Robb, Ph.D., at 82.

[117] Expert Report of Alicia M. Robb, Ph.D., at 93.

out systemic racism" and serve as "an initial roadmap for making sure our programs and services are accessible."[118] While the agency's efforts in this regard are commendable, the stated need for such a plan stands as one further and unfortunate acknowledgement that the agency has still not yet "root[ed] out systemic racism" in its programs.

81.     Moreover, the USDA's own data continue to show that systemic discrimination in USDA's lending and funding programs is anything but a relic of the past. Despite the decades of reports, analyses, and confessions documenting the agency's abhorrent discriminatory conduct, and despite the agency's many vows that it will mend its ways, systemic discrimination at the USDA continues to infect and permeate the USDA's lending and funding programs.

82.     The data cited by Dr. Robb only begins to tell the whole story. In particular, the USDA's loan data from FY2017 and well into FY2022 show that approval rates for loan applications from Black farmers–which in 2017 were already more than 20% lower than approval rates for white farmers–dropped sharply after 2019, from about 48% to only 33%, whereas approval rates for white farmers remained relatively flat at about 70%.

83.     Controlling for average farm value, income, productivity, and other relevant factors, the data show that the proportion of farms with direct loans in a given area remains negatively correlated to the percent of farms with Black producers.[119] These findings are not only consistent across these years, but the disparity increases significantly in fiscal years 2021 and 2022. In other words, despite the USDA's admissions of its discriminatory "past," the disparate impact of its direct loan program on Black farmers and ranchers not only continues, but in recent years has gotten even worse. In fact, according to the USDA's data, and after controlling for farm

---

[118] USDA Releases Equity Action Plan (Apr. 14, 2022), https://www.usda.gov/media/press-releases/2022/04/14/usda-releases-equity-action-plan (last visited Aug. 8, 2023) (quoting Secretary Vilsack).

[119] Plaintiffs obtained USDA loan data through a FOIA request, and the USDA provided data through May 2022.

characteristics and creditworthiness, the higher the representation of Black farm producers in a given county, the lower both the proportion of farms that receive direct loans and the lower the average loan amount. These findings are consistent over time and across regions.

84.     This disproportionate treatment in the data cannot be explained by a decrease in the proportion of Black farmers applying for loans. In fact, the percentage of loan applications by Black farmers has increased since 2019, and in 2021 it was at a five-year high. Instead, these disparities are consistent with and evidence of ongoing discriminatory treatment in the USDA's loan programs.

85.     Two separate analyses have confirmed the strong evidence of ongoing racial disparities in the USDA's own loan data. As stated in one analysis:

> Rejection rates for loans from the USDA were comparable for White farmers and for all non-White farmers in 2017 but diverged sharply after 2019, according to 2017-21 fiscal year USDA data obtained by CNN through a Freedom of Information Act request. The divergence is primarily driven by higher rejections for Black and Asian farmers.

> Only 2% of farmers of color and 4% of Black farmers were denied loans from USDA-approved lenders in 2021, the data shows. But for direct loans from the USDA itself, a program the agency says is designed to provide financing for farmers unable to find it elsewhere, denials were much higher. The agency denied funds to 20% of all farmers of color and 42% of Black farmers in 2021.[120]

86.     As stated in another recent analysis: "The agency granted loans to only 37 percent of Black applicants last year in one program that helps farmers pay for land, equipment and repairs but accepted 71 percent of applications from white farmers, according to a POLITICO analysis of

---

[120] Chandelis Duster and Jamie Boschma, Many Black farmers nationwide struggling to keep their families afloat as they face disparities across the board, CNN (Dec. 5, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html (last visited Aug. 8, 2023).

USDA data."[121] Additional recent reporting found that,

> In 2022, the department granted direct loans to only 36% of farmers who identified as Black, according to an NPR analysis of USDA data that looked at how many direct loan applications were accepted, rejected or withdrawn per each racial group. Direct loans are supposed to be among the easiest to get at USDA. They are meant for farmers who can't get credit elsewhere and can be used to get land, farming equipment or other operational costs needed to keep the business afloat. In contrast, 72% of white farmers who applied were approved.[122]

87.     Another practice of the USDA that results in discriminatory treatment of Black farmers relates to the justification the USDA gives for denying loans. According to the USDA, the primary and consistent justification the USDA has given Black farmers for their loan denials is "Unacceptable credit history – pattern of bad credit within applicant's control." In other words, while on one hand the USDA fully acknowledges its history of rampant discrimination and the massive economic impact this has had on Black farmers, on the other it continues to deny them adequate and equal access to direct loans while blaming *them* for lacking sufficient credit, thereby perpetuating the agency's discriminatory treatment.

88.     The agency's ongoing discriminatory practices are not only expressed in approval rates and loan terms, they manifest in many other ways as well, including through improper requests and unreasonable delays in the application process as well as unreasonable delays in the disbursement of funds and unwarranted requirements attached to repayment. As a result of these delays, Black farmers are often not able to plant crops until well into the growing season, subjecting them to substantial risk and significant damage to their yields and profits.

89.     The evidence of ongoing discrimination present in the agency's own loan data is

---

[121] Ximena Bustillo, 'Rampant issues': Black farmers are still left out at USDA, POLITICO (July 5, 2021, 7:00 a.m.), https://www.politico.com/news/2021/07/05/black-farmers-left-out-usda-497876 (last visited Aug. 8, 2023).

[122] Ximena Bustillo, In 2022, Black farmers were persistently left behind from the USDA's loan system, NPR (Feb. 19, 2023, 10:36 a.m.), https://www.npr.org/2023/02/19/1156851675/in-2022-black-farmers-were-persistently-left-behind-from-the-usdas-loan-system (last visited Aug. 8, 2023).

especially disturbing given the USDA's acknowledgments regarding the financial challenges faced by minority farmers in combination with the agency's role as a lender of last resort. The USDA well knows that these farmers have nowhere else to turn, yet it continues the same practices and policies that it well knows result in disparate impact. In sum, while the agency's pronouncements and admissions about its discriminatory "past" are an important step forward, the fact remains that systemic discrimination is still a real and ongoing problem that the USDA has yet to resolve.

E.     The USDA's Market Facilitation Program ("MFP")

90.     In 2018 and 2019, USDA authorized the FSA to distribute more than $20 billion through the MFP to compensate farmers for the economic impacts associated with tariffs and the country's escalating trade dispute with China, among other countries. As the FSA explained it, the MFP was designed to provide "direct payments to help producers who have been directly impacted by illegal retaliatory tariffs."[123] The USDA only made payments available to eligible producers of specified commodities of its determination.[124]

91.     The creation and implementation of MFP departed from traditional policymaking procedure in that it was unilaterally implemented by the Executive Branch without any Congressional approval.[125] Indeed, it has been widely reported that the MFP was designed by the

---

[123] Farm Service Agency, Market Facilitation Program Fact Sheet, Sept. 2019.

[124] *See id.*

[125] Congressional Research Service, Farm Policy: USDA's 2019 Trade Aid Package (Updated Nov. 26, 2019), https://crsreports.congress.gov/product/pdf/R/R45865 ("USDA's use of CCC [*i.e.*, Commodity Credit Corporation] authority to initiate and fund agricultural support programs without congressional involvement is not without precedent, but the scope and scale of its use for the two trade aid packages—at $28 billion—has increased congressional and public interest."); Farm Policy: Comparison of 2018 and 2019 MFP Programs, (Aug. 12, 2019), IF11289.pdf (congress.gov) ("During 2018 and 2019, the U.S. Department of Agriculture (USDA) announced two rounds of trade aid valued at a combined $28 billion. USDA is using its authority under the Commodity Credit Corporation (CCC) Charter Act to establish and fund the trade aid packages."); Dan Charles, Farmers Got Billions From Taxpayers In 2019, And Hardly Anyone Objected, NPR (Dec. 31, 2019, 4:13 p.m.), https://www.npr.org/sections/thesalt/2019/12/31/790261705/farmers-got-billions-from-taxpayers-in-2019-and-hardly-anyone-objected ("Yet the USDA created this new program out of thin air; it decided that an old law authorizing a USDA program called the Commodity Credit Corp. already gave it the authority to spend this money."); USDA Economic Research Service, Agricultural Income and Finance Situation and Outlook: 2021 Edition (Nov. 2021), https://www.ers.usda.gov/webdocs/publications/102670/eib-228.pdf?v=9951 at 23 ("The Market Facilitation

Administration of President Trump to avoid political fallout from an important source of the Administration's political support.[126] The MFP was designed, implemented, and administered without any specific congressional appropriation or statutory guidance regarding how the funds should be distributed.

92.     In 2018, the USDA distributed about $8.6 billion in payments under the MFP.[127] In 2019, the USDA distributed about $14.4 billion in payments under the MFP.[128]

93.     Virtually all MFP payments went to white farmers. In fact, a comprehensive analysis of the distribution of funds from the MFP data provided by the USDA revealed that white farmers received over 99.5% of the funds disbursed by the USDA, and that white farmers received, on average, an MFP payment ten times larger than Black farmers.[129] According to that study, white farmers received a total of about $21 billion, and Black farmers received only about $38 million.[130]

94.     The existence of a discriminatory purpose is a reasonable and justified inference given the stark inequities perpetuated by the MFP. Indeed, it is difficult to explain the outcome on

---

Program (MFP) was authorized by President Trump and USDA Secretary Purdue (USDA, OCE, 2018) in 2018 in response to retaliatory trade actions by China and other major trade partners. It was designed to provide support to producers to adjust to trade disruptions."); *id.* ("MFP was designed and implemented as an ad hoc program")

[126] *See, e.g.*, Stuart Anderson, Trump Tariff Aid To Farmers Cost More Than U.S. Nuclear Forces, Forbes (Jan. 21, 2020, 12:11 a.m.), https://www.forbes.com/sites/stuartanderson/2020/01/21/trump-tariff-aid-to-farmers-cost-more-than-us-nuclear-forces/?sh=1bb5e896c501 (last visited Aug. 8, 2023) ("To shore up support from farmers, Donald Trump approved increasing amounts of government aid to farmers harmed by trade policies that the Trump administration itself initiated. Trump was open about the purpose of the payments.").

[127] Government Accountability Office, USDA Market Facilitation Program: Stronger Adherence to Quality Guidelines Would Improve Future Economic Analyses at n. 3 (Nov. 2021) GAO-22-468.

[128] *Id.*

[129] Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers | Environmental Working Group ("EWG") (Feb. 18, 2021), available at https://perma.cc/PVZ7-QMFD (last visited Aug. 8, 2023); *see also* Donald Carr, Trump's Farm Bailout Program Continue USDA's Racist Legacy (July 11, 2019), https://www.ewg.org/news-insights/news/trumps-farm-bailout-program-continues-usdas-racist-legacy (last visited Aug. 8, 2023) ("According to EWG's Farm Subsidy Database, in 2018 the largest 10 percent of MFP recipients received more than half of total payments. Rather than adopt strict payment and income limits, as the Trump administration proposed for farm subsidies in its FY 2019 and FY 2020 budget requests, the administration instead chose to apply the same broken rules that for decades have funneled farm subsidies to the biggest farms. These rules are especially unfair to African-American, Latino and Latina, and Asian farmers, who tend to have smaller operations than white farmers – and are less likely to be eligible for government farm supports at all.").

[130] *Id.*

any grounds other than discriminatory intent. Moreover, the U.S. Senate Committee on Agriculture, Nutrition, and Forestry ("Senate Agriculture Committee") recognized that the program was intentionally designed by the USDA to pick "winners and losers."[131] As a report by the Senate Agriculture Committee noted, the design of the MFP resulted in widely varying payments for similarly situated farms. Among other intentional decisions, the USDA targeted payments at a county level, favored large operations, and disproportionately awarded subsidies based on type of crop. All such decisions were made in the face of data and facts establishing that the USDA's chosen criteria would disadvantage farmers of color.

95.    Moreover, while the stark pattern of disparate treatment of Black farmers in the MFP speaks for itself, Plaintiffs further allege—based on information, belief, and available reporting—that the MFP intentionally sought to maximize payments based on political considerations. In short, the MFP's disparate treatment of Black farmers was by design.

96.    According to the GAO, total MFP payments and payment rates varied widely among commodities and regions.[132] The GAO concluded that in calculating MFP payments the USDA used flawed methodologies that were not transparent to decision makers and the public.[133]

97.    Another analysis of MFP data also concluded that the funding disparities were due to discriminatory practices:

> The MFP has almost exclusively benefitted white men and their families, who appear to be disproportionately upper middle-class or wealthy. These payments further entrench already drastic inequalities in agriculture, along racial, ethnic, gender, and class

---

[131] Senate Agriculture Committee , President Trump's "Aid Not Trade" Policy: Skewed Payments Choose Winners and Losers, Fail to Help Farmers Hit the Hardest (Nov. 2019) Available at https://www.agriculture.senate.gov/imo/media/doc/MFP%20Report%20FINAL.pdf.

[132] USDA Market Facilitation Program: Stronger Adherence to Quality Guidelines Would Improve Future Economic Analyses, at 1.

[133] USDA Market Facilitation Program: Stronger Adherence to Quality Guidelines Would Improve Future Economic Analyses  at What GAO Found.

lines. These disparities are the result of historical and recent discrimination.[134]

Likewise, the USDA's expert has explained how the design of the MFP disproportionately benefitted white farmers to the detriment of farmers of color.[135] As Secretary Vilsack acknowledges, the resulting racial disparities in the MFP are yet another example of "systemic discrimination against [B]lack farmers."[136]

98.   Exacerbating the USDA's deliberate design of the MFP to benefit certain farming operations over others, the administrative apparatus used to facilitate applications for MFP funds continued the USDA's policy and practice of decentralized authority–i.e., reliance on local USDA offices. For so many USDA subsidy programs, access to funds often starts with education, information, applications, and assistance from USDA officials. Knowing that Black farmers have been consistently mistreated at the local level, the USDA has chosen to perpetuate significant inequities in its subsidy programs like the MFP by continuing to allocate such information, assistance, and office resources through local offices. The MFP encapsulated the egregious

---

[134] Nathan Rosenberg & Bryce W. Stucki, USDA Gave Almost 100 Percent Of Trump's Trade War Bailout To White Farmers, Farm Bill Law Enterprises (July 24, 2019), https://www.farmbilllaw.org/2019/07/24/usda-gave-almost-100-percent-of-trumps-trade-war-bailout-to-white-farmers/ (last visited Aug. 8, 2023).

[135] Cobb Decl. ¶ 52 (Mar. 11, 2022), ECF No. 168-1, *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) ("Minority farmers are disproportionately less likely to participate in or benefit from certain types of financial assistance that USDA offers in part because minority farmers generally have smaller farms, and therefore receive a disproportionately small share of funds provided through USDA payment programs, many of which, like the recent Market Facilitation Program discussed in more detail below, are based on crop-acreage or are targeted to crops typically grown on large farms."); *id.* ¶ 59 ("[T]he Market Facilitation Program (MFP) provided direct payments to farmers impacted by foreign retaliatory trade practices, resulting in the loss of traditional markets, in 2018 and 2019. However, the program tended to benefit larger farms, and for MFP payees and payments for 2018 and 2019, minorities accounted for an average of 8,733 payees per year (1.4%) and an average of $116.50 million in payments per year (1%).").

[136] Ariana Figueroa, House Agriculture panel probes 'systemic' USDA discrimination against Black farmers, Virginia Mercury (Mar. 26, 2021, 11:12 a.m.), https://www.virginiamercury.com/2021/03/26/house-agriculture-panel-probes-systemic-usda-discrimination-against-black-farmers/ (last visited Aug. 8, 2023), ("'The history of systemic discrimination against Black farmers has been well-documented,' Vilsack, the former governor of Iowa, said in his opening statement. 'Despite all that has been done, clearly more needs to be done to drive our efforts deeper.' Vilsack pointed out that just 0.1% of Black farmers received any of the $26 billion in economic relief that went to farmers in a Trump administration USDA program that used funds from a COVID-19 bill and other sources. Of that portion, only $20.8 million went to Black farmers.").

inequities that repeatedly result from this failed policy. The MFP continued the USDA's longstanding policy of using local offices as the gatekeepers for federal subsidy programs, while knowing exactly how such local control ends—with discrimination against Black farmers. Thus, the USDA's policy choices related to the MFP continued its pattern of perpetuating unequal access to funds by race, while knowing that such results are the inevitable result of those choices.

99.     Indeed, the agency has expressly admitted that MFP funds did not "reach minority farmers equitably."[137] That result occurred both through the design of the MFP and USDA continuing its pattern of enabling discriminatory administration of its programs through local offices.

100.    Both years of the MFP were skewed toward large farms, which are predominantly owned by white farmers.[138] The continued pattern of directing subsidies to large farming operations perpetuates and builds on decades on discrimination that have advantaged white farmers. With white famers having a significant head start in terms of the size, profitability, and efficiency of their operations, the MFP made a deliberate decision to further the advancement of those already in possession of that head start.[139]

101.    Racial discrimination in the design and administration of the MFP has been widely recognized:

---

[137] Cobb Decl. ¶ 83 (Mar. 11, 2021) ECF No. 168-1, *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.).

[138] Expert Report of Alicia M. Robb, Ph.D., at 92-93 ("Furthermore, other factors are themselves strongly correlated with other effects of discrimination. For instance, many government programs tend to favor large farms, such as programs for certain crops that are economically feasible only at large scale. Large farms are disproportionately farmed by whites, who therefore receive a disproportionate share of the benefits of those programs. As discussed above, however, the smaller size of minority farms in terms of acreage and revenue is likely due in no small part to historical discrimination in USDA loan programs that have deprived minority farmers of necessary credit and services."), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex. 2021).

[139] See, e.g., *Holman v. Vilsack*, No. 21-1085, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) ("It is undisputed that the USDA has a sad history of discriminating against certain groups of farmers based on their race. The evidence in the record reveals systemic racial discrimination by the USDA (and in particular the FSA) throughout the twentieth century which has compounded over time, resulting in bankruptcies, land loss, a reduced number of minority farmers, and diminished income for the remaining minority farmers.").

> How does USDA send almost $24 billion in no-strings-attached taxpayer money to U.S. farmers and ranchers in two years and socially disadvantaged farmers and ranchers end up with nothing more than chicken feed?

> Simple, DOJ notes in its June 18 court filing, "Congress again found . . . the lingering effects of systemic discrimination in USDA programs."

> In fact, it added, quoting Senate Ag Committee Chair Debbie Stabenow, a Michigan Democrat, USDA's "latent barriers and historic discrimination" remain so strong that "73 percent of Black farmers were not even aware of the agricultural aid provision of the[se] coronavirus rescue programs."[140]

102.   The USDA itself notes repeated findings of key legislators as to discrimination in

USDA programs including the recent funding provided by MFP. In particular, as stated by the

USDA:

> [T]he overwhelming majority of recent agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers— again, in part due to the lingering effects of discrimination. Specifically, the reporting indicated that 99.4 percent of USDA's Market Facilitation Program (MFP) payments went to white farmers, *see* S1264-65; *see also id.* H766, and nearly 97 percent of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP) in 2020 likewise went to non-minority farmers, *see id.* S1264-65; H766. Senator Stabenow explained that "[t]he diminished relationships between [SDFRs] and USDA as a result of both latent barriers and historic discrimination limit[ed]" SDFRs' access to, and participation in, USDA programs, such that "73 percent of Black farmers . . . were not even aware of the agricultural aid provisions of the[se] coronavirus rescue programs." *Id.* S1264. A letter introduced into the record from 13 full-time professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem," by preferring certain crops (those produced by white farmers) and "reward[ing] the largest farms the most" (those owned

---

[140] Alan Guebert, Here's what the numbers say about systemic discrimination in the USDA, Farm and Dairy (July 1, 2021)   https://www.farmanddairy.com/columns/heres-what-the-numbers-say-about-systemic-discrimination-in-the-usda/670617.html (last visited Aug. 8, 2023).

by white farmers), thereby "distort[ing] credit, land, input costs, and markets" to the disadvantage of minority farmers.[141]

103.    Evidence of the discriminatory purpose of the MFP is further revealed by the fact that the racial disparities that resulted through the funding of both programs was entirely foreseeable and known by the USDA.[142]

104.    The discriminatory purpose of the MFP is further evidenced by the existence of other less discriminatory alternatives. As just one example, USDA could have implemented payment and income limits, but instead designed the program to subsidize large farms, knowing the racial impact of that decision and that it perpetuated the cumulative effects of invidious discrimination by the agency.[143] Likewise, the USDA could have implemented outreach efforts

---

[141] Gov't's Resp. to Pl.'s Mot. for Prelim. Injunction at 11 (June 4, 2021), ECF No. 22, *Wynn v. Vilsack*, No. 21-cv-00514 (M.D. Fla.).

[142] Expert Report of Alicia M. Robb, Ph.D., at 6 ("I have been asked to review the evidence of discrimination against minority farmers in USDA's lending programs, evaluate the data related to the status of minority farmers today, and opine on whether the data are consistent with the expected effects of the documented history of discrimination against minority farmers in USDA's lending programs. Based on my review and analysis, I have concluded that they are."), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.); *id*. at 8 ("These present-day disparities are consistent with the expected effects of the well-documented and systemic historical discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination."); *id*. at 92-93 ("Furthermore, other factors are themselves strongly correlated with other effects of discrimination. For instance, many government programs tend to favor large farms, such as programs for certain crops that are economically feasible only at large scale. Large farms are disproportionately farmed by whites, who therefore receive a disproportionate share of the benefits of those programs. …[H]owever, the smaller size of minority farms in terms of acreage and revenue is likely due in no small part to historical discrimination in USDA loan programs that have deprived minority farmers of necessary credit and services.") *id*. at 101 ("Reporting indicates that these disparities are attributable to the fact that agricultural funding tends to favor large farms."); *id*. at 101-102 ("[G]iven the magnitude of these programs—more than $23 billion over two years under the MFP, and nearly $24 billion under the CFAP—compared to the total amount of minority farmers' direct and guaranteed loan balances—only about $4 billion (*see* Table 18)—one can expect the impact of these disparate payments to be significant.").

[143] Expert Report of Alicia M. Robb, Ph.D., at 5; *id*. at 8 ("These present-day disparities are consistent with the expected effects of the well-documented and systemic historical discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination."); *id*. at 42 ("These disparities and other lingering effects are consistent with the well-documented and systemic discrimination in the provision of USDA loans and technical assistance to minority farmers and are not solely the product of race-neutral factors untainted by discrimination."); *id*. at 82 ("The disparities between minority and non-minority farmers today cannot be explained solely by differences in factors untainted by discrimination. These disparities are instead consistent with what one would expect given historical discrimination against minority farmers in USDA's loan programs and the nature of agricultural credit markets."); *id*. at 90 ("[T]here are significant disparities between the acreage of minority farms and non-minority farms; between the market value of products sold by minority farmers and non-minority farmers; and between the net income of minority farmers and non-minority farmers. These

from inception of the program to reduce racial disparities in distribution of MFP funds.

      **F.**    **Plaintiffs' Experiences Further Confirm Ongoing, Systemic Discrimination**

     105.   Plaintiffs' experiences, including loan denials and discriminatory practices as recently as this growing season, demonstrate that the USDA continues to perpetuate longstanding practices that systematically disadvantage and mistreat Black farmers.

     106.   Like so many other Black farmers, Mr. Pride no longer even attempts to obtain financing from the USDA for crop loans given ongoing issues with USDA crop lending. Within the last year, Mr. Pride had the opportunity to purchase 160 acres to add to his operation and pursued a loan from the USDA to facilitate the purchase. The USDA informed Mr. Pride that he would need to secure the loan with his entire farming operation and land as collateral, an unreasonable requirement that had no sound economic justification given that his land and operation are worth far more than the land he sought to acquire. Well-aware of the USDA's long history of aggressive foreclosure actions against Black farmers, Mr. Pride was unwilling to risk his farm that he has spent a career building from scratch. He lost the opportunity to acquire the land as a result. Mr. Pride's experience is consistent with longstanding USDA practices of imposing unreasonably onerous lending requirements on and otherwise discouraging Black farmers seeking capital loans, hamstringing their ability to expand or improve their operations.

     107.   Having retired from the Army Corps of Engineers and a veteran of military service eager to return to farming, Mr. Roddy should have been the ideal recipient of a new farm loan. Instead, the USDA summarily and unreasonably denied his application 10 years ago, forcing him to borrow from his retirement account to self-fund his operation. Mr. Roddy tried again by applying for a crop loan for the 2020 growing season and was denied, despite a 10-year track

---

large disparities, across several relevant metrics, strongly suggest that discrimination in agricultural lending markets, including by USDA, is a primary explanation.").

record of regularly paying back crop loans. When he has received approvals, the approvals arrive too late in the growing season to impact the productivity of his operation. Lack of access to USDA lending continues to undermine the profitability of his operation, as he cannot afford to raise more profitable crops, invest in crop inputs to maximize yields, or buy land.

108.    Mr. Lee's farm has been reduced from 700 to 80 acres as a result of his lack of access to USDA loans. In recent years, the USDA has delayed loan approvals into the planting season even when it has approved crop loans, which has crippled the profitability of Mr. Lee's operation. Prior to the 2023 planting season, the USDA informed Mr. Lee that it would not lend to him for a period of three years. Based on Mr. Lee's interactions with the USDA, the decision was made without a full review of his loan application and for considerations that have nothing to do with the merits of his loan application. Like others, Mr. Lee has been told that he has been placed on a blacklist by his USDA office. The impacts of USDA denying and delaying loans have been devastating. Without access to capital to fully fund planting on 700 acres, he lost his lease and has been forced to reduce his operation to 80 acres. His farming operation may not survive the moratorium that the USDA arbitrarily imposed on lending to Mr. Lee.

109.    Mr. Anderson has experienced discriminatory treatment from the USDA twice in the past five years. In 2019, he applied for a simple consolidation loan. The USDA responded with repeated and unwarranted requests for information, resulting in obfuscation and delay that caused Mr. Anderson to have to abandon his application. In early 2023, Mr. Anderson applied for another loan. The USDA informed him that his application would be denied because of creditworthiness, despite Mr. Anderson's good credit rating, and informed him that he should "withdraw" his application and apply again in three years. The USDA's discriminatory lending practices have severely hindered Mr. Anderson's ability to operate, to the extent that he cannot afford to maintain

and update equipment or spend the funds necessary to sufficiently maintain his crops.

110.   Despite a long track record as a farmer and borrower, Mr. Harris has been unable to obtain a USDA loan for several years. Over the years, the USDA has slow-walked action on his loans by delaying review, halting the approval process for technicalities, using the mail to notify him of purported deficiencies that could be cured by a phone call, and myriad other tactics that delay or interrupt seasonal planting. The USDA consistently obstructs, rather than facilitates Mr. Harris's applications for loans. Mr. Harris's persistence in attempting to navigate the USDA's loan obstruction and denials has included in-person meetings, and during a recent meeting he was informed that he had been placed on a "blacklist" that has nothing to do with his financial performance or ability to repay USDA loans. Mr. Harris has lost leases and has faced diminished productivity due to the lack of access to USDA loans. His operation has been diminished from 3000 to 600 acres, and he fears losing his livelihood altogether based on recent loan denials.

111.   Collectively, Plaintiffs have been subjected to and suffered from ongoing discrimination in USDA lending practices that have plagued the agency for years, including discrimination flowing from the USDA's deliberate policies and practices of decentralized authority and subjective criteria that, notwithstanding the agency's knowledge of its history of racial discrimination, has only subjected Plaintiffs to further and arbitrary discriminatory treatment at the hands of local USDA loan offices. Not only have Plaintiffs experienced unjustified loan denials, they have been on the receiving end of obstruction, including processing delays and admonitions that discourage applications altogether. Plaintiffs' inability, as a consequence of Defendants' conduct, to obtain adequately-funded, timely, streamlined lending as required by law has severely damaged the size, efficiency, and profitability of their farming operations. Their operations have shrunk and stagnated through lost opportunities, even as otherwise similarly

situated white farmers with unfettered, non-discriminatory access to USDA lending have flourished.

112.    The USDA's discrimination against Plaintiffs extended to the MFP program. Given the design and implementation of the program, Plaintiffs are among the Black farmers who received little or nothing from the MFP despite suffering serious economic impacts from trade retaliation against U.S. agricultural products. Plaintiffs were injured by the design and administration of a program that managed to direct 99.5% of more than $20 billion to white farmers, even as Plaintiffs were at least as economically vulnerable to fallout from tariffs as white farmers.

## CLASS ALLEGATIONS

113.    The USDA has already acknowledged the strong basis for class relief. Indeed, when speaking to an audience of Black farmers about the USDA's discriminatory conduct, Secretary Vilsack candidly admitted the need to address, in his words, "'the cumulative effect of discrimination against a class of people, not individuals, but a class.'"[144]

114.    Likewise, in *Miller v. Vilsack*, the USDA acknowledged that "there is a large body of evidence that the minority groups included in the USDA's definition of 'socially disadvantaged groups'…have suffered from discrimination in USDA programs with nation-wide scope."[145]

115.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and the similarly situated proposed Direct Loan Class:

> All Black farmers and ranchers who reside in the United States and who, in the USDA's administration of its direct loan program, and within the applicable limitations period subject to continuing violations, received inferior service or were

---

[144] Emma Hurt, The USDA Is Set To Give Black Farmers Debt Relief. They've Heard That One Before, NPR (June 4, 2021, 4:48 p.m.) https://www.npr.org/2021/06/04/1003313657/the-usda-is-set-to-give-black-farmers-debt-relief-theyve-heard-that-one-before (quoting Secretary Vilsack) (last visited Aug. 8, 2023).

[145] Gov't's Resp. in Opp'n to Pl.'s Mot. for Prelim. Injunction at 41 (June 11, 2021), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (ECF No. 27).

denied access to credit as compared to similarly situated non-minority farmers. Without limitation, the USDA Direct Loan Class includes those farmers and ranchers who:

(a) applied for a loan but were subject to an unreasonable or unwarranted denial or coerced withdrawal;

(b) applied or attempted to apply for a loan but did not receive one due to unreasonable or undue delays or requests and/or lack of assistance;

(c) received a loan but were subject to unreasonable or undue delays or requests during loan application processing;

(d) received a loan but with unfavorable terms, such as lower principal amount, higher interest rate, and/or other burdensome conditions relating to repayment, oversight, securitization, or servicing; and/or

(e) were dissuaded or discouraged from applying for a loan through the USDA's discriminatory conduct or denial of outreach or assistance.

116.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and the similarly situated proposed MFP Class:

All Black farmers and ranchers who reside in the United States and who were denied funds or received disproportionately fewer funds under the MFP program.

117.     This action may properly be maintained as a class action pursuant to the requirements of Fed. R. Civ. P. 23, including Rules 23(b)(2), 23(b)(3), and/or 23(c)(4).

118.     **Numerosity:** The Class is so numerous that joinder of all its members is impracticable. The USDA frequently publishes statistics on Black farmers and ranchers in the United States, acknowledging 48,697 Black producers based on the 2017 Census of Agriculture.[146] According to the USDA and its data, these producers are located across the country, further making joinder of all producers impracticable. Because the USDA maintains census, loan, and other data on Black producers and more generally on socially disadvantaged farmers and ranchers,

---

[146]     USDA, National Agriculture Statistics Service, Black Produces (Oct. 2019) https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pd

membership in the Class, therefore, is readily ascertainable from Defendants' own records.

119.   **Commonality:** Common questions of law and fact exist as to the Class and predominate over questions affecting only individual Class members. As acknowledged by the USDA and its officials, and as outlined in numerous reports including that of the USDA's own expert, Dr. Robb, Class members have suffered common discriminatory impacts based on their race. As Black farmers, Class members have suffered from adverse USDA lending policies and practices that perpetuate loan processing and determinations that discriminate based on race and disproportionately disadvantage Black farmers. Likewise, Class members have been disadvantaged in the MFP based on race, including the starkly disparate outcomes in the funds received by Black farmers. Common questions include without limitation:

(a) whether Defendants discriminated against Class members by improperly impacting access to credit, such as through denials or coerced withdrawals, under the USDA direct loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

(b) whether Defendants discriminated against Class members by improperly impacting access to credit through delays in the application process under the USDA direct loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

(c) whether Defendants discriminated against Class members by improperly impacting access to credit through unwarranted requests or conditions in the application process under the USDA direct loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

(d) whether Defendants discriminated against Class members by improperly impacting access to credit through imposing restrictive or unwarranted terms and conditions on loans under the USDA direct loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

(e) whether Defendants discriminated against Class members by improperly denying or restricting access to funds under the USDA Market Facilitation Program in violation of the Due Process clause of the Fifth Amendment of the U.S. Constitution;

(f) whether Defendants discriminated against Class members by failing to adequately inform Class Members of the existence of the USDA's MFP in violation of the Due Process clause of the Fifth Amendment of the U.S. Constitution;

(g) whether Class members are entitled to a declaration that Defendants have violated and denied the rights of the Class as to their statutory right to equal credit under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), with respect to USDA's direct loan program;

(h) whether Class members are entitled to a declaration that Defendants have violated and denied the constitutional right of the Class to equal protection under the Fifth Amendment in connection with the distribution of funds for the USDA's MFP;

(i) whether Defendants discriminated against Class members by employing a policy and practice of decentralized authority that deliberately places the fate of Black farmers in the hands of local administrators that regularly use delegated powers to apply subjective criteria and discretion to discriminatory effects; and

(j) whether Defendants discriminated against Class members by favoring wealthier and/or larger farms, which has a disproportionate impact on Black farmers.

120.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the members of the Class were denied equal access to credit under the USDA's direct loan program and were denied equal protection in connection with the USDA's Market Facilitation Program as a result of USDA's discriminatory conduct described herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

121.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members they seek to represent; they retained counsel competent and experienced in both the underlying legal issues and complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

122.    **Predominance.** Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class members. Similar or identical statutory and constitutional violations, practices, and injuries are

involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action. Therefore, the common questions of law and fact identified above predominate over any questions affecting only individual Class members.

123.   **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the Class members pale compared to the burden and expense that would be required to litigate their claims on an individual basis against the USDA, making it impracticable for Class members to individually seek redress for the USDA's wrongful conduct. Moreover, individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

124.   Class members' claims are additionally or alternatively certifiable because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendants, (b) the prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests, and (c) Defendants have acted, failed to act, and refused to act on grounds common to the Class, thereby making declaratory, special, and injunctive relief appropriate with respect to the Class as a whole.

125.   Furthermore, particular issues under Rule 23(c)(4) are appropriate for certification

because Plaintiffs' claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests herein.

### COUNT I – VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT

126.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference all the above paragraphs of this Complaint as though fully stated herein.

127.    The Equal Credit Opportunity Act ("ECOA") states that it "shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) because the applicant has in good faith exercised any right under this chapter."[147]

128.    The ECOA defines "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit."[148]

129.    The ECOA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."[149]

130.    The ECOA defines "creditor" to mean "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew,

---

[147] 15 U.S.C. § 1691(a).
[148] 15 U.S.C. § 1691a(b).
[149] 15 U.S.C. § 1691a(d).

or continue credit."[150]

131.     The ECOA defines "person" to mean "a natural person, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association."[151]

132.     The ECOA creates a private right of action against a creditor who violates its anti-discrimination provisions. Specifically, the ECOA provides that a "creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class."[152]

133.     The ECOA further authorizes "equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter."[153]

134.     The Plaintiffs and Direct Loan Class members are "applicants" under the ECOA.

135.     The USDA, including the FSA, is a "creditor" under the ECOA and is subject to the ECOA's requirements and prohibitions.

136.     The USDA has violated the ECOA, 15 U.S.C. § 1691(a), by unlawfully discriminating against the Plaintiffs and Direct Loan Class members on the basis of their race. Specifically, as described herein, the USDA and FSA have discriminated against the Plaintiffs and Direct Loan Class members throughout the direct loan process by, among other things, dissuading loan applicants from applying, failing to assist with loan applications, failing to timely process loan applications, denying loan applications or causing them to be withdrawn, subjecting loans to adverse terms and onerous supervision, and failing to properly service loans.

---

[150] 15 U.S.C. § 1691a(e).
[151] 15 U.S.C. § 1691a(f).
[152] 15 U.S.C. § 1691e(a).
[153] 15 U.S.C. § 1691e(c).

137.    The USDA has violated the ECOA by treating Black farmers less favorably because of their race in the administration of its direct loan program. By its own admission, and as established in numerous reports and in the USDA's loan data, the USDA has engaged and continues to engage in a pattern and practice of discrimination against Black farmers in the administration of its direct loan program. The USDA's disparate treatment of Black farmers has caused and continues to cause substantial harm to Plaintiffs and the Direct Loan Class members.

138.    By the admission of the USDA's own expert, the USDA's discrimination has manifested in many ways throughout the loan cycle, including disparate treatment in: 1) outreach and education about existing loan programs and eligibility; 2) assistance with loan applications; 3) processing time for applications; 4) loan application approvals; 5) post-disbursement loan servicing; and 6) the imposition of additional loan requirements. The USDA's disparate treatment has been to the obvious and continuing detriment of minority farmers, including Plaintiffs and the Direct Loan Class Members.

139.    The USDA has violated the ECOA by implementing practices and policies that have caused and are continuing to cause a disparate impact to Black farmers in the administration of its direct loan program. Such practices and policies include but are not limited to the long-standing and continued decentralization of the approval and administration of loans to local loan officers and the promulgation of subjective loan criteria by which direct loans are approved and administered. Such practices and policies further include knowingly favoring larger and wealthier farms, which are disproportionately owned by whites who therefore receive a disproportionate share of USDA funds.[154] These loan practices and policies have had a significant adverse and disproportionate impact on Plaintiffs and the Direct Loan Class members, denying them equal

---

[154] *See, e.g.,* Expert Report of Alicia M. Robb, Ph.D. (Jan. 7, 2022), *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) (No. 168-2) at 92-93.

access to the USDA's direct loan program.

140.    Plaintiffs and the Class seek all monetary, declaratory, injunctive, and other relief available under the ECOA to remedy the improper conduct of USDA in connection with its loan programs as alleged herein.

**COUNT II – EQUAL PROTECTION VIOLATION OF THE DUE
PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION**

141.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference all the above paragraphs of this Complaint as though fully stated herein.

142.    The Constitution prohibits the federal government from discriminating based on race.

143.    By every measure, the USDA's allocation of MFP funds disproportionately favored white farmers, while disadvantaging Black and other farmers of color. The extreme nature and stark pattern of the disparate impact—with 99.5% of MFP funds being allocated to white farmers—belies and evidences intentional discriminatory motives in the design, implementation, and administration of the program.

144.    By making intentional decisions about the allocation of MFP funds by farming location, type, and scale, the USDA's design of the MFP supports the conclusion that the agency knowingly chose to disproportionately benefit white farmers. The extreme racial disparities in the MFP were plainly foreseeable and known to the agency when it designed and implemented the program.

145.    The purpose of the MFP, as well as the procedures and circumstances surrounding its implementation, evidence discriminatory motives. Discrimination in allocation of MFP funds is further suggested by the existence of myriad alternative policies and procedures that the USDA could have implemented to mitigate the disparate treatment of Black farmers.

51

146.     Plaintiffs and the MFP Class members suffered damage by not receiving MFP funds and by receiving less MFP funds than they would have received had the program not been tainted by discrimination. Plaintiffs and the MFP Class members have received disproportionately fewer funds under the MFP than white farmers.

147.     Plaintiffs and the MFP Class members seek all available relief to remedy the equal protection violations associated with the USDA's MFP, including, inter alia, expansion of benefits to eliminate disparate impacts. As the USDA has argued in litigation, extension and expansion of benefits is a proper remedy for an equal protection.[155]

## COUNT III – DECLARATORY JUDGMENT

148.     Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference all the above paragraphs of this Complaint as though fully stated herein.

149.     An actual controversy exists between Plaintiffs and the Class on the one hand, and Defendants on the other, as to their rights with respect to the USDA's loan programs administered by the FSA and the distribution of funds for MFP.

150.     Plaintiffs and the Class members pray that this Court declare and determine, pursuant to 28 U.S.C. § 2201, that the USDA and FSA have violated and denied the rights of Plaintiffs and the Class members as to: (a) the statutory right of the Plaintiffs and the Direct Loan Class members to equal credit under the ECOA, 15 U.S.C. § 1691(a), with respect to USDA's direct loan programs administered by the FSA; and (b) the constitutional right of Plaintiffs and the MFP Class members to equal protection under the Fifth Amendment in connection with the

---

[155] *See* Gov't's Br. in Supp. of Mot. for Summ. J. at 43 (Mar. 11, 2022), ECF No. 168, *Miller v. Vilsack*, No. 21-cv-00595-O (N.D. Tex.) ("In cases 'involving equal protection challenges to underinclusive federal benefits statutes,' the Supreme Court has explained, the 'proper course' is ordinarily to extend benefits to the excluded claimant asserting that the 'relief that courts ordinarily enter to remedy an equal protection violation' is an 'extension of the benefits to those excluded under the challenged provision.'" (citations omitted)).

distribution of funds for MFP.

Plaintiffs and the Class members also pray that the Court grant any necessary and appropriate ancillary relief as permitted by 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that this Court enter judgment against Defendants as follows:

(a)    An Order finding and declaring that the Defendants have unlawfully discriminated against Plaintiffs and Direct Loan Class members in connection with the USDA's direct loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), and awarding Plaintiffs and Class members declaratory, injunctive, and monetary relief pursuant to 15 U.S.C. §§ 1691e(a) and (c);

(b)    An Order finding and declaring that Defendants' distribution of funds in connection with the Market Facilitation Program violated Plaintiffs' and MFP Class members' constitutional right to equal protection and due process, and awarding Plaintiffs and Class members declaratory, injunctive, specific, and all other available relief to remedy the unconstitutional agency conduct and impact;

(c)    An Order declaring, pursuant to 28 U.S.C. § 2201, that Plaintiffs and Direct Loan Class members were unlawfully discriminated against in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), along with all other available relief as permitted by 28 U.S.C. § 2022;

(d)    An Order declaring, pursuant to 28 U.S.C. § 2201, that Plaintiffs and MFP Class members were denied their constitutional right to equal protection in connection with the Market Facilitation Program, along with all other available relief as permitted by 28 U.S.C. § 2202;

(e)    An Order granting Plaintiffs and Class members an award of attorneys' fees and costs pursuant to the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(d), and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(f)    Such other and further declaratory, injunctive, and monetary relief as the Court may deem just, proper, or equitable.

Dated: August 8, 2023                          Respectfully submitted,

                                               *s/ Shaunda Patterson-Strachan*
                                               Shaunda Patterson-Strachan (DC # 459501)
                                               FAEGRE DRINKER BIDDLE & REATH LLP
                                               1500 K Street NW, Suite 1100
                                               Washington, DC 20005
                                               Tel: +1 202 230 5000
                                               Fax: +1 202 842 8465
                                               shaunda.pattersonstrachan@faegredrinker.com

                                               Jonathan W. Dettmann (*pro hac vice* forthcoming)
                                               Craig S. Coleman (*pro hac vice* forthcoming)
                                               FAEGRE DRINKER BIDDLE & REATH LLP
                                               2200 Wells Fargo Center
                                               90 South Seventh Street
                                               Minneapolis, MN 55402
                                               Tel: +1 612 766 7000
                                               Fax: +1 612 766 1600
                                               jon.dettmann@faegredrinker.com
                                               craig.coleman@faegredrinker.com

                                               Colby Anne Kingsbury (*pro hac vice* forthcoming)
                                               FAEGRE DRINKER BIDDLE & REATH LLP
                                               320 South Canal Street, Suite 3300
                                               Chicago, IL 60606
                                               Tel: +1 312 569 1000
                                               Fax: +1 312 569 3000
                                               colby.kingsbury@faegredrinker.com

                                               Gregg W. Mackuse (*pro hac vice* forthcoming)
                                               FAEGRE DRINKER BIDDLE & REATH LLP
                                               One Logan Square, Suite 2000
                                               Philadelphia, PA 19103
                                               Tel: +1 215 988 2700
                                               Fax: +1 215 988 2757
                                               gregg.mackuse@faegredrinker.com

                                               Emanuel L. McMiller (*pro hac vice* forthcoming)
                                               FAEGRE DRINKER BIDDLE & REATH LLP
                                               300 N. Meridian Street, Suite 2500
                                               Indianapolis, IN 46204
                                               Tel: +1 317 237 0300
                                               Fax: +1 317 237 1000
                                               manny.mcmiller@faegredrinker.com

John Calvin Patterson (*pro hac vice* forthcoming)
Wes Ehrhardt (*pro hac vice* forthcoming)
PATTERSON & EHRHARDT, PLLC
213 North Main St.
Como, MS 38619
Tel: +1 662 298 4054
Fax: +1 662 586 1556
jcp@pelaws.com
wde@pelaws.com

*Attorneys for Plaintiffs*