**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY PRIDE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 23-2292 (LLA) |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Larry Pride, Marvin Roddy, Victor Lee, Gary Harris, and Chris Anderson are Black farmers from Mississippi and Arkansas.  ECF No. 1 ¶¶ 12-16.  They sue Defendants—the U.S. Department of Agriculture ("USDA"), the Farm Service Agency ("FSA"), USDA Secretary Thomas J. Vilsack, and FSA Administrator Zach Ducheneaux—in this putative class action, alleging that the USDA employed racially discriminatory practices in administering its direct lending program and its (now defunct) Market Facilitation Program.  *Id.* ¶¶ 2, 17-20, 136-39, 143-47.  Defendants move to dismiss.  ECF No. 31.  For the reasons explained below, the court will **GRANT** in part and **DENY** in part Defendants' motion.

### I.       Factual Background

The court turns first to the direct loan program, and then to the Market Facilitation Program. In resolving Defendants' motion to dismiss, the court accepts the facts alleged in Plaintiffs' complaint as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.     Allegations Concerning the Direct Loan Program

### 1.     The Direct Loan Program

The USDA, through the FSA, offers direct loans to family farmers and ranchers who cannot obtain commercial loans.  ECF No. 1 ¶¶ 21-22.  The goal of the program is "to provide progression lending and management assistance to eligible farmers to become owners or operators . . . of family farms, to continue such operations when credit is not available elsewhere, or to return to normal farming operations after sustaining substantial losses as a result of a . . . disaster."  7 C.F.R. § 761.1(c).  A recipient might use her USDA loan to, for example, buy or enlarge a farm or ranch, construct or improve buildings, or purchase livestock, seed, or equipment.  ECF No. 1 ¶¶ 24-26; *see* 7 U.S.C. §§ 1922, 1941.  As Plaintiffs put it, "[a]gricultural lending is the indispensable fuel of the farm economy"—and the USDA is the lender of last resort.  ECF No. 1 ¶¶ 3, 89.

To be eligible for a USDA direct loan, an applicant must (1) be a U.S. citizen; (2) be a current or prospective owner or operator of a "family farm"; (3) be unable to obtain sufficient credit elsewhere on reasonable terms; and (4) have enough farming experience or training "to assure reasonable prospects of success."  *See* 7 U.S.C. §§ 1922(a)(1), 1941(a)(1); ECF No. 31-1, at 2.  The applicant submits a number of documents, including a description of their farm training and experience, three years of farm financial and production records, documentation showing that they cannot obtain credit elsewhere, and a farm operating plan.  *See* 7 C.F.R. § 764.51; ECF No. 31-1 at 2.  The USDA delegates the administration of its direct loan programs to local FSA officials.  *See* 7 C.F.R. § 761.1; ECF No. 1 ¶ 29; ECF No. 31-1, at 2.  Local FSA staff review loan applications and decide, subject to certain criteria, whether to grant or deny them.  ECF No. 31-1, at 2-3; *see* 7 C.F.R. § 764.401.

There is a long and well-documented history of racial discrimination in the USDA's direct lending programs.  Plaintiffs cite a series of government-issued and commissioned reports—

beginning in 1965 and stretching into 2021—cataloguing racial disparities and outright discrimination in the USDA's lending practices. *See* ECF No. 1 ¶¶ 31-51. To name just a few: a 1982 report by the United States Commission on Civil Rights observed a "broad range of discriminatory actions" by the USDA, including denying Black farmers the opportunity to submit loan applications, taking "inordinate time" to process their applications, and subjecting Black farmers to "disrespect, embarrassment, and humiliation." *Id.* ¶ 37 (quoting U.S. Comm'n on C.R., ED222604, *The Decline of Black Farming in America* 84, 134 (1982)). A 1997 USDA report recognized "persistent problems" in the agency's treatment of minority farmers and acknowledged that, "[d]espite the fact that discrimination in program delivery . . . has been documented and discussed, it continues to exist to a large degree unabated." *Id.* ¶ 39 (quoting U.S. Dep't of Agric., *Civil Rights at the United States Department of Agriculture: A Report by the Civil Rights Action Team* 2, 57 (1997)). A 2005 report by the USDA Office of the Inspector General ("USDA OIG") "found that FSA loan decisions for the previous eight years had disproportionately benefitted nonminority farmers." *Id.* ¶ 40. A 2011 report commissioned by the USDA found that agency employees "recognize[d] the inequitable customer service" provided to socially disadvantaged customers, "but d[id] not see it as a problem because 'it ha[d] always been done this way' and there [wa]s no penalty for continuing to do so." *Id.* ¶ 47. In 2019 and again in 2021, the Government Accountability Office issued reports identifying "racial and income disparities in access to financial services and availability of credit" to the detriment of women and minority farmers. *Id.* ¶¶ 48-49. And there is an equally long history of litigation challenging these practices as racially discriminatory. *See, e.g.*, *Pigford v. Glickman*, 206 F.3d 1212 (D.C. Cir. 2000) (approving consent decree in class action brought by Black farmers); ECF No. 1 ¶ 41 n.42

(summarizing cases filed on behalf of Native American, Hispanic, and women farmers, several of which ended in settlement).

This history—and its devastating impacts on Black farmers—is not in dispute.  Defendants themselves state that "Congress and the [USDA] have long acknowledged historical discrimination that has contributed to disparities between non-minority and minority farmers."  ECF No. 31-1, at 1.  In 2021, Secretary Vilsack testified before Congress that "the history of discrimination against Black [f]armers by USDA . . . has prevented numerous African-Americans . . . from fully realizing the same level of prosperity and success as their white counterparts."  ECF No. 1 ¶ 54. Instead, the parties dispute whether USDA's well-documented historical discrimination against Black farmers continues today.

### 2.      Plaintiffs' allegations

Plaintiffs are Black farmers who have applied or attempted to apply for USDA loans but have been stymied by alleged racial discrimination.   Broadly, they allege two types of discriminatory treatment: (1) "unjustified loan denials" and (2) "obstruction, including processing delays and admonitions that discourage applications altogether."  *Id.* ¶ 111.

Plaintiff Larry Pride has farmed in Panola County, Mississippi since 1985.  *Id.* ¶ 12.  He owns 600 acres and produces soybeans, corn, beef cattle, and timber.  *Id.*  Mr. Pride recently pursued a USDA loan to purchase 160 acres of land.  *Id.* ¶ 106.  The USDA told Mr. Pride that he would have "to secure the loan with his entire farming operation and land as collateral"—even though his land and operation were worth more than the 160 acres he sought to buy.  *Id.* "Well-aware of the USDA's long history of aggressive foreclosure actions against Black farmers, Mr. Pride was unwilling to risk his farm that he has spent a career building from scratch."  *Id.* Without the USDA loan, Mr. Pride lost the opportunity to acquire the land.  *Id.*  Plaintiffs allege that "Mr. Pride's experience is consistent with longstanding USDA practices of imposing

unreasonably onerous lending requirements on and otherwise discouraging Black farmers seeking capital loans." *Id.*

Plaintiff Marvin Roddy grew up in a farming family. *Id.* ¶ 13. After retiring from the Army Corps of Engineers, he sought to return to farming. *Id.* Mr. Roddy leased 300 acres in Tunica County, Mississippi to cultivate row crops such as soybeans. *Id.* Ten years ago, he applied for a USDA loan and was "summarily" denied, "forcing him to borrow from his retirement account to self-fund his operation." *Id.* ¶ 107. In 2020, Mr. Roddy tried again. *Id.* He applied for a crop loan and was denied, "despite a 10-year track record of regularly paying back" such loans. *Id.* While Mr. Roddy has been approved for other USDA loans, "the approvals arrive[d] too late in the growing season to impact the productivity of his operation." *Id.* Limited access to USDA lending "continues to undermine the profitability of [Mr. Roddy's] operation, as he cannot afford to raise more profitable crops, invest in crop inputs to maximize yields, or buy land." *Id.*

Plaintiff Victor Lee has farmed in McGehee, Arkansas since 2015. *Id.* ¶ 14. He leased and planted roughly 700 acres to produce row crops such as soybeans—but, due to lack of access to USDA loans, "he lost his lease and has been forced to reduce his operation to 80 acres." *Id.* ¶¶ 14, 108. "In recent years, the USDA has delayed loan approvals into the planting season even when it has approved crop loans, which has crippled the profitability of Mr. Lee's operation." *Id.* ¶ 108. Further, "[p]rior to the 2023 planting season, the USDA informed Mr. Lee that it would not lend to him for a period of three years." *Id.* This decision "was made without a full review of his loan application and for considerations that have nothing to do with the merits of his loan application." *Id.* In fact, "Mr. Lee has been told that he has been placed on a blacklist by his USDA office." *Id.* He fears that his farming operation may not survive. *Id.*

Plaintiff Chris Anderson has farmed in McGehee, Arkansas since 1990. *Id.* ¶ 15. He has leased and planted as many as 400 acres and produced row crops such as soybeans, wheat, milo, and corn. *Id.* Mr. Anderson cites two instances of discriminatory treatment by the USDA in the last five years. *Id.* ¶ 109. In 2019, he applied for a consolidation loan. *Id.* "The USDA responded with repeated and unwarranted requests for information, resulting in obfuscation and delay that caused Mr. Anderson to have to abandon his application." *Id.* In 2023, when Mr. Anderson applied for another loan, "[t]he USDA informed him that his application would be denied because of creditworthiness, despite Mr. Anderson's good credit rating, and informed him that he should 'withdraw' his application and apply again in three years." *Id.* As a result, Mr. Anderson "cannot afford to maintain and update equipment or spend the funds necessary to sufficiently maintain his crops." *Id.*

Plaintiff Gary Harris has farmed in Grady, Arkansas since 2013. *Id.* ¶ 16. He once leased and farmed 3000 acres, producing row crops such as soybeans and corn and raising cattle. *Id.* Mr. Harris's operation has been reduced to 600 acres because, "[d]espite a long track record as a farmer and borrower, Mr. Harris has been unable to obtain a USDA loan for several years." *Id.* ¶ 110. The USDA has "slow-walked action on his loans by delaying review, halting the approval process for technicalities, using the mail to notify him of purported deficiencies that could be cured by a phone call, and myriad other tactics." *Id.* These actions have delayed or interrupted seasonal planting. *Id.* At a recent meeting with agency officials, Mr. Harris "was informed that he had been placed on a 'blacklist' that has nothing to do with his financial performance or ability to repay USDA loans." *Id.* Mr. Harris "fears losing his livelihood altogether based on recent loan denials." *Id.*

### B.        Allegations Concerning the Market Facilitation Program

In 2018, USDA launched the Market Facilitation Program ("MFP") to distribute more than $20 billion in direct payments to farmers impacted by retaliatory tariffs.[1]  *Id.* ¶¶ 6, 90.  Per Plaintiffs, the MFP was "unilaterally implemented by the Executive Branch without any Congressional approval" and "was designed by the Administration of President Trump to avoid political fallout from an important source of the Administration's political support."  *Id.* ¶ 91.  "Virtually all MFP payments went to white farmers."  *Id.* ¶ 93.  White farmers received over 99.5% of MFP funds and, on average, their MFP payments were ten times larger than those received by Black farmers.  *Id.*  Ultimately, white farmers received about $21 billion in MFP payments, while Black farmers received roughly $38 million.  *Id.*  Plaintiffs allege that they "are among the Black farmers who received little or nothing from the MFP despite suffering serious economic impacts from trade retaliation against U.S. agricultural products."  *Id.* ¶ 112.

The MFP's enrollment period closed on December 20, 2019.  ECF No. 31-1, at 4.  The USDA issued its final round of direct payments on February 3, 2020.  *Id.*

## II.        Procedural History

Plaintiffs filed this putative class action in August 2023, bringing two claims.  First, Plaintiffs allege that the USDA violates the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, by administering its direct lending programs in a racially discriminatory manner (Count I).  ECF No. 1 ¶ 136.  Plaintiffs offer two theories of discrimination: disparate treatment

---

[1] Specifically, MFP was a response to "retaliatory trade actions by China and other major trade partners" and "was designed to provide support to producers to adjust to trade disruptions." ECF No. 1 ¶ 91 n.125 (quoting Robert Dubman, et al., U.S. Dep't of Agric. Econ. Rsch. Serv., *Agricultural Income and Finance Situation and Outlook: 2021 Edition* 23 (2021), https://perma.cc/XD62-GVPY).

and disparate impact. *See id.* ¶¶ 137-39; ECF No. 33, at 29, 32. They seek declaratory, injunctive, and monetary relief on behalf of a proposed Direct Loan Class, defined as follows:

> All Black farmers and ranchers who reside in the United States and who, in the USDA's administration of its direct loan program, and within the applicable limitations period subject to continuing violations, received inferior service or were denied access to credit as compared to similarly situated non-minority farmers. Without limitation, the USDA Direct Loan Class includes those farmers and ranchers who:
>
> (a) applied for a loan but were subject to an unreasonable or unwarranted denial or coerced withdrawal;
>
> (b) applied or attempted to apply for a loan but did not receive one due to unreasonable or undue delays or requests and/or lack of assistance;
>
> (c) received a loan but were subject to unreasonable or undue delays or requests during loan application processing;
>
> (d) received a loan but with unfavorable terms, such as lower principal amount, higher interest rate, and/or other burdensome conditions relating to repayment, oversight, securitization, or servicing; and/or
>
> (e) were dissuaded or discouraged from applying for a loan through the USDA's discriminatory conduct or denial of outreach or assistance.

ECF No. 1 ¶¶ 115, 140.

Second, Plaintiffs allege that the USDA's Market Facilitation Program was racially discriminatory by design and therefore violated the Fifth Amendment's guarantee of equal protection (Count II). *Id.* ¶¶ 143-46. They seek declaratory as well as injunctive relief, in the form of the "expansion of benefits to eliminate disparate impacts." *Id.* ¶ 147; *see id.* at 53. Plaintiffs define their proposed MFP Class as: "All Black farmers and ranchers who reside in the United States and who were denied funds or received disproportionately fewer funds under the MFP program." *Id.* ¶ 116.

Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 31.  They argue that Plaintiffs have failed to state a claim for either disparate treatment or disparate impact under the ECOA.  ECF No. 36, at 12.  As to Plaintiffs' MFP claim, Defendants argue that Plaintiffs lack standing, that the claim is moot, and—in the alternative— that Plaintiffs have failed to state an equal protection claim.  ECF No. 31-1, at 1, 7.

This court stayed the deadline for Plaintiffs to file a motion to certify their proposed class, pursuant to Local Civil Rule 23.1(b), until after the court resolved Defendants' motion to dismiss. *See* Oct. 11, 2023 Minute Order.

### III.    Legal Standard

Plaintiffs bear the burden of establishing subject-matter jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  In reviewing a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court will "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a motion to dismiss under Rule 12(b)(6), the court will accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Id.*

9

### IV.    Discussion

Plaintiffs bring two claims.  Count I alleges that Defendants violated the Equal Credit Opportunity Act by administering the direct loan program in a racially discriminatory manner.  ECF No. 1  ¶¶ 126-40.    Count II argues that Defendants' Market Facilitation Program discriminated on the basis of race in violation of the Fifth Amendment's equal protection clause.  *Id.* ¶¶ 141-47.  The court will dismiss Count I in part and Count II in full.

### A.    Equal Credit Opportunity Act Claims (Count I)

The purpose of the ECOA "is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1(b).  To that end, the statute makes it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" because of the applicant's race.  15 U.S.C. § 1691(a).  An "applicant" is "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit."  *Id.* § 1691a(b).  "The statute defines the term 'creditor' to include the United States government, *see* 15 U.S.C. §§ 1691a(e), (f), and thereby waives the United States' sovereign immunity for claims brought under the ECOA."  *Bradshaw v. Vilsack*, 560 F. Supp. 3d 101, 134 (D.D.C. 2021).  The ECOA's statute of limitations is five years.  15 U.S.C. § 1691e(f).

Plaintiffs bring this suit under the ECOA's private right of action provision, 15 U.S.C. § 1691e(a), seeking declaratory and injunctive relief, money damages, and attorney's fees and

costs.  ECF No. 1 ¶¶ 132, 140; *id.* at 53.  They have two theories of liability: disparate treatment and disparate impact.[2]  The court addresses each in turn.

### 1.  Disparate treatment: Discrete claims

To determine whether Plaintiffs have stated a disparate treatment claim under the ECOA, it is useful to categorize Plaintiffs' claims by the type of discriminatory treatment they allege:

- **Loan denial**:

  - Mr. Roddy alleges that he applied for a crop loan for the 2020 growing season and was denied.  ECF No. 1 ¶ 107.[3]

- **Prospective loan denial**:

  - Mr. Lee alleges that, "[p]rior to the 2023 planting season, the USDA informed Mr. Lee that it would not lend to him for a period of three years."  *Id.* ¶ 108.

  - Mr. Lee and Mr. Harris allege that the USDA placed them on a lending "blacklist." *Id.* ¶¶ 108, 110.

  - Mr. Anderson alleges that, when he applied for a loan in 2023, "[t]he USDA informed him that his application would be denied because of creditworthiness . . . and informed him that he should 'withdraw' his application and apply again in three years."  *Id.* ¶ 109.

---

[2] Generally, a plaintiff alleging disparate treatment "must establish that the defendant had a discriminatory intent or motive," while a plaintiff alleging disparate impact "challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale."  *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

[3] Mr. Roddy also alleges that "the USDA summarily and unreasonably denied his [direct loan] application 10 years ago."  ECF No. 1 ¶ 107.  To the extent that Plaintiffs attempt to bring an ECOA claim based on this loan denial, it is outside of the statute of limitations and therefore barred.  *See* 15 U.S.C. § 1691e(f).

- **Lending terms**:

  o Mr. Pride alleges that, when he "pursued a loan from the USDA to facilitate the purchase" of 160 acres, the USDA informed him "that he would need to secure the loan with his entire farming operation and land as collateral," despite the fact that "his land and operation [we]re worth far more than the land he sought to acquire." *Id.* ¶ 106.  Because Mr. Pride "was unwilling to risk his farm that he has spent a career building from scratch[,] . . . . [he] lost the opportunity to acquire the land." *Id.*

- **Application processing:**

  o Mr. Anderson alleges that, when he applied for a consolidation loan in 2019, "[t]he USDA responded with repeated and unwarranted requests for information, resulting in obfuscation and delay that caused Mr. Anderson to have to abandon his application." *Id.* ¶ 109.

  o Mr. Harris alleges that the USDA has "obstruct[ed]" and "slow-walked" his loan applications by "delaying review, halting the approval process for technicalities, using the mail to notify him of purported deficiencies that could be cured by a phone call, and myriad other tactics." *Id.* ¶ 110.

- **Delayed loan approvals:**

  o Mr. Roddy alleges that, "[w]hen he has received [loan] approvals, the approvals arrive too late in the growing season to impact the productivity of his operation." *Id.* ¶ 107.

o   Mr. Lee alleges that "the USDA has delayed loan approvals into the planting season
even when it has approved crop loans, which has crippled the profitability of [his]
operation." *Id.* ¶ 108.

Defendants argue that, to prevail on a disparate treatment claim under the ECOA, a plaintiff
must demonstrate that "(1) she was a member of a protected class, (2) she applied for and was
qualified for a loan with the [lending institution], (3) the loan was rejected despite her
qualifications, and (4) the [lending institution] continued to approve loans for applicants with
similar qualifications." *Rahmaan v. Fed. Nat'l. Mortg. Ass'n.*, No. 02-CV-1822, 2003 WL
21940044, at *2 (D.D.C. Mar. 20, 2003) (quoting *Rowe v. Union Planters Bank*, 289 F.3d 533,
535 (8th Cir. 2002)); *see Stefanowicz v. SunTrust Mortg.*, 765 F. App'x 766, 772 (3d Cir. 2019);
ECF No. 31-1, at 15.  Defendants do not dispute that Plaintiffs belong to a protected class but argue
that Plaintiffs fail to plead facts that would plausibly allege the requisite second, third, and fourth
elements.  ECF No. 31-1, at 16, 18.

Defendants are correct as to Mr. Roddy's 2020 loan denial claim.  Mr. Roddy does not
allege that he was qualified for the 2020 loan.  *See* ECF No. 1 ¶ 107.  He merely states that, when
he applied, he had "a 10-year track record of regularly paying back crop loans." *Id.*  This makes
it *possible* that Mr. Roddy was qualified for the 2020 loan, but—especially given the
multi-factorial nature of a loan determination, *see* 7 C.F.R. § 764.101—this single fact does not
push Mr. Roddy's claim over the line from possibility to plausibility.  *Cf. Walker v. Bank of Am.
Corp.*, No. 18-CV-2466, 2019 WL 3766824, at *5 (D. Md. Aug. 8, 2019) (finding that an ECOA
plaintiff sufficiently alleged that she was qualified for a loan where she attested to her strong credit
scores and various sources of regular income and contended that a loan officer had told her that
her documents were 'in order' and '[y]ou have a lot of money.'").  Because Mr. Roddy has not

sufficiently pleaded that he was qualified for the 2020 loan, he has failed to state a claim that the USDA violated the ECOA by denying him that loan.

But it is not clear that the same four-part test applies to Plaintiffs' remaining ECOA disparate treatment claims. Plaintiffs claim that Defendants violated the ECOA not by actually denying them loans (as in a traditional ECOA claim), but by stating that they intended to deny Plaintiffs loans in the future, subjecting them to discriminatory lending terms, and delaying or obstructing their loan applications and approvals. *See* ECF No. 1 ¶¶ 106-10. When an ECOA plaintiff claims something other than a discriminatory loan denial, courts have applied something other than the standard four-part test advanced by Defendants. For example, the court in *Hildebrandt v. Vilsack*, 102 F. Supp. 3d 318 (D.D.C. 2015), held that when an applicant alleges she was denied the opportunity to apply for a loan (rather than denied the loan itself), she need not prove that she would have been qualified for the loan. *Id.* at 323-24. *But see Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 708 (5th Cir. 2017) (holding that "[d]iscouragement of a 'prospective applicant' . . . cannot form the basis of a private claim or cause of action under the ECOA"). Or take *Carroll v. Walden University, LLC*, 650 F. Supp. 3d 342 (D. Md. 2022), where the plaintiffs alleged that the defendant had violated the ECOA by extending credit on unfair, discriminatory terms—a practice known as "reverse redlining." *Id.* at 360. The court explained that, in order to state such a claim, "Plaintiffs must allege that the Defendants' lending practices and loan terms were 'unfair' and 'predatory,' and that the Defendants either intentionally targeted [them] on the basis of race, or that there is a disparate impact on the basis of race." *Id.* at 357 (quoting *U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 14-CV-0008, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014)). These standards are quite different from the four-part test Defendants offer in their motion to dismiss.

It is not clear which, if any, of these alternative tests might apply to Plaintiffs' claims, and the parties have not robustly briefed the issue. But it is clear that Plaintiffs have pleaded something other than a traditional ECOA loan-denial claim, such that the traditional four-part test might therefore be inapplicable. Because Defendants' argument turns solely on the requirements of that four-part test, the court cannot grant the motion to dismiss on that reasoning alone. The court will therefore dismiss Mr. Roddy's 2020 loan denial claim, *see* ECF No. 1 ¶ 107, but it will allow Plaintiffs' remaining ECOA disparate treatment claims to move forward.

### 2.      Disparate treatment: Pattern-or-practice claim

In making their disparate treatment claim, Plaintiffs argue that "the USDA has engaged and continues to engage in a pattern and practice of discrimination against Black farmers in the administration of its direct loan program." *Id.* ¶ 137. The "Class Allegations" section of the complaint further alleges that "Class members have suffered from adverse USDA lending policies and practices that perpetuate loan processing and determinations that discriminate based on race and disproportionately disadvantage Black farmers." *Id.* ¶ 119. One of the "common questions" shared by the class, according to Plaintiffs, is "whether Defendants discriminated against Class members by employing a policy and practice of decentralized authority that deliberately places the fate of Black farmers in the hands of local administrators that regularly use delegated powers to apply subjective criteria and discretion to discriminatory effects." *Id.* ¶ 119(i).

Defendants ask the court to strike these allegations, arguing that "[i]n addition to the pleading defects as to the individual Plaintiffs' ECOA claims, the Complaint fails to adequately allege a classwide, ECOA pattern-or-practice claim of disparate treatment in light of Rule 23's requirements." ECF No. 31-1, at 23. Per Defendants, "Plaintiffs have pleaded themselves out of plausibly alleging a patten-or-practice ECOA discrimination claim because their central theory of

disparate treatment—discrimination at 'the hands of local administrators,' . . . necessarily requires that individual questions of purported discrimination will predominate." *Id.* at 25.

"[W]hether a plaintiff has satisfied the requirements under Rule 23 for a class action is not an appropriate inquiry at the motion to dismiss stage." *Dochak v. Polskie Linie Lotnicze LOT S.A.*, 189 F. Supp. 3d 798, 809 (N.D. Ill. 2016). "While some courts in other circuits have used Rule 12(f) to strike facially implausible class allegations, courts in this circuit strongly disfavor [such] motions to strike."[4] *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 85 (D.D.C. 2013). The parties have already agreed to delay briefing on class certification pursuant to Local Civil Rule 23.1(b) until after the court resolves Defendants' motion to dismiss. *See* Oct. 11, 2023 Minute Order. In light of this agreement, the court will deny without prejudice Defendants' motion to dismiss Plaintiffs' classwide disparate treatment pattern-or-practice claim. Defendants may raise the argument again at the class certification stage.

### 3.    Disparate impact claims

As a threshold matter, the D.C. Circuit has never definitively determined whether disparate impact claims are cognizable under the ECOA. *See Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006) (assuming without deciding that disparate impact claims are cognizable under the ECOA); *see also Palmer v. Homecomings Fin. LLC*, 677 F. Supp. 2d 233, 240 (D.D.C. 2010) ("There appears to be agreement among the federal courts that disparate impact claims are

---

[4] And courts in this circuit are not alone. *See, e.g.*, *Arkin v. Innocutis Holdings, LLC*, 188 F. Supp. 3d 1304, 1312 (M.D. Fla. 2016) ("Eleventh Circuit 'precedent . . . counsels that the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified.'" (quoting *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008))); *Swain v. CACH, LLC*, 699 F. Supp. 2d 1117, 1124 (N.D. Cal. 2009) ("[C]ompliance with [Federal Rule of Civil Procedure] 23 is not to be tested by a motion to dismiss for failure to state a claim." (quoting *Gillibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir. 1969))).

permissible under the ECOA.").  But the court need not address that question that today, because Defendants do not move to dismiss Plaintiffs' claim on that ground.  *See* ECF No. 36, at 12 (arguing that Plaintiffs' claims fail "[r]egardless of whether a disparate impact claim is cognizable in this Circuit").

An ECOA disparate impact claim "require[s] a plaintiff to 'identify a specific policy or practice which the defendant has used to discriminate and must also demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group.'"  *Garcia*, 444 F.3d at 633 (quoting *Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481, 487 (N.D.N.Y. 2004)). Plaintiffs identify three policies that disparately impact Black farmers: (1) "the long-standing and continued decentralization of the approval and administration of loans to local loan officers"; (2) "the promulgation of subjective loan criteria by which direct loans are approved and administered"; and (3) "knowingly favoring larger and wealthier farms, which are disproportionately owned by whites who therefore receive a disproportionate share of USDA funds."  ECF No. 1 ¶ 139.

Defendants first argue that "the promulgation of subjective loan criteria by which direct loans are approved and administered" is not specific enough to constitute a discriminatory policy giving rise to a disparate impact claim.  ECF No. 36, at 12-13.  As the Supreme Court has noted in the context of Title VII disparate impact claims, "the plaintiff is . . . responsible for isolating and identifying the specific . . . practices that are allegedly responsible for any observed statistical disparities."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988).  This requirement prevents a defendant from "being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances.'"  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989)).  Thus, courts considering ECOA

disparate impact claims have found that a challenge to the "overall loan origination process" would be too generalized, but that a challenge to a defendant's "discretionary pricing policy" is sufficiently specific. *See Barrett v. H & R Block, Inc.*, 652 F. Supp. 2d 104, 110 (D. Mass. 2009); *see also Palmer*, 677 F. Supp. 2d at 241; *Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C. Cir. 2019) (noting that "[a]n actionable 'specific . . . practice' might be a set of 'subjective criteria'" that the defendant uses to make a decision (quoting *Wards Cove Packing Co.*, 490 U.S. at 656)).

Here, Plaintiffs allege that the "USDA . . . inject[s] a high degree of subjectivity throughout all stages of the direct loan process: from the loan inquiry stage, and on through the loan application stage, the loan approval/denial/withdrawal stage, and the setting of loan terms and conditions." ECF No. 1 ¶ 30.  They further contend that the "USDA's criteria for its direct loans intentionally lack quantitative, objective standards and vest local agency loan officers with broad authority and discretion in the loan process." *Id.*  While "it is not overwhelmingly clear" precisely what subjective determinations the USDA empowers local officers to make, a description of a policy need "not [be] very elaborate" to survive a motion to dismiss. *Palmer*, 677 F. Supp. 2d at 241. The alleged use of criteria that "intentionally lack qualitative, objective standards" at "all stages of the direct loan process," ECF No. 1 ¶ 30, is essentially an allegation that the USDA uses "a set of 'subjective criteria'" to make decisions—and that is enough, at the motion-to-dismiss stage, to allege a disparate impact claim, *Davis*, 925 F.3d at 1249 (quoting *Wards Cove Packing Co.*, 490 U.S. at 656).  Indeed, other courts have permitted ECOA plaintiffs to allege disparate impact claims on the basis of the USDA's "subjective loan decisionmaking criteria." *See, e.g.*, *Garcia*, 444 F.3d at 635; *Love v. Johanns*, 439 F.3d 723, 725 (D.C. Cir. 2006).

Second, Defendants argue that Plaintiffs fail to adequately allege a causal connection between the USDA's discriminatory policies and the statistical disparities Plaintiffs cite in their complaint.  ECF No. 26, at 13-15.  To prevail on their disparate impact claim, Plaintiffs will ultimately need to proffer "statistical evidence that the practice or policy has an adverse effect on the protected group." *Garcia*, 444 F.3d at 633 (quoting *Powell*, 310 F. Supp. 2d at 487).  But that is not their burden today.  At the motion-to-dismiss stage, a disparate impact plaintiff's "sole burden is to 'allege some statistical disparity, however elementary, in order for [the defendant] to have any sense of the nature and scope of [the plaintiff's] allegation.'"  *Feloni v. Mayorkas*, No. 22-CV-2094, 2023 WL 3180313, at *8 (D.D.C. May 1, 2023) (quoting *Jianqing Wu v. Special Couns., Inc.*, 54 F. Supp. 3d 48, 54 (D.D.C. 2014), *aff'd* No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015)); *see Tolton v. Day*, No. 19-CV-945, 2020 WL 2542129, at *27 (D.D.C. May 19, 2020) (finding that disparate impact claims survived a motion to dismiss even though plaintiffs' statistical evidence "suffer[ed] from a number of flaws.").  In fact, a disparate impact plaintiff "need not present statistical evidence in his complaint" at all.  *Jianqing Wu*, 2015 WL 10761295, at *2; *see Tolton*, 2020 WL 2542129, at *25.  So long as the plaintiff "provide[s] information to plausibly show that a statistical disparity exists among the group of people affected by the challenged practice" and "indicate[s] in the complaint that she will later be able to provide some sort of statistical evidence" going to causation, the court will deny a motion to dismiss. *Brown v. Mayorkas*, No. 20-CV-3107, 2023 WL 3303862, at *11-12 (D.D.C. May 8, 2023).

Plaintiffs have cleared that low bar by alleging the following:

- "[T]he USDA's loan data from FY2017 and well into FY2022 show that approval rates for loan applications from Black farmers—which in 2017 were already more than 20% lower than approval rates for white farmers—dropped sharply after 2019,

from about 48% to only 33%, whereas approval rates for white farmers remained relatively flat at about 70%";

- "Controlling for average farm value, income, productivity, and other relevant factors, the data show that the proportion of farms with direct loans in a given area remains negatively correlated to the percent of farms with Black producers.  These findings are not only consistent across these years, but the disparity increases significantly in fiscal years 2021 and 2022";

- "This disproportionate treatment in the data cannot be explained by a decrease in the proportion of Black farmers applying for loans.  In fact, the percentage of loan applications by Black farmers has increased since 2019, and in 2021 it was at a five-year high";

- "Rejection rates for loans from the USDA were comparable for White farmers and for all non-White farmers in 2017 but diverged sharply after 2019, according to 2017-21 fiscal year USDA data obtained by CNN through a Freedom of Information Act request.  The divergence is primarily driven by higher rejections for Black and Asian farmers";

- "Only 2% of farmers of color and 4% of Black farmers were denied loans from USDA-approved lenders in 2021, the data shows.  But for direct loans from the USDA itself, a program the agency says is designed to provide financing for farmers unable to find it elsewhere, denials were much higher.  The agency denied funds to 20% of all farmers of color and 42% of Black farmers in 2021."

ECF No. 1 ¶¶ 82-85.

Reading these allegations together, Plaintiffs have plausibly alleged that Black farmers are less likely to receive direct loans than their white counterparts, and that this disparity cannot be explained by average farm value, income, productivity, a decrease in the proportion of Black farmers applying for loans,  or "other relevant factors."  *Id.* ¶ 83.  Plaintiffs have thus sufficiently alleged at least "some statistical disparity" to survive a motion to dismiss.  *Feloni*, 2023 WL 3180313, at *8 (quoting *Jianqing Wu*, 54 F. Supp. 3d at 54).

Defendants counter that Plaintiffs rely too heavily on a report submitted by the USDA's expert, Dr. Alicia Robb (the "Robb Report") in a different case: *Miller v. Vilsack*, No. 21-CV-0595, 2021 WL 6129207 (N.D. Tex. Mar. 11, 2022).  ECF No. 36, at 14.  Per Defendants, the Robb Report is inapposite because it focuses on "identifying existing disparities consistent with the effects of past discrimination [by the USDA]," not current discrimination, and it "makes no mention of USDA's policies of decentralization or any of the purportedly subjective criteria—as they relate to USDA's Direct Loan Program—that Plaintiffs now claim give rise to the alleged statistical disparities."  *Id.*  Plaintiffs read the Robb Report differently.  They acknowledge that the main purpose of the report was to assess the present-day effects of the USDA's past discrimination but argue that Dr. Robb "nevertheless found that state-specific data from 2017 to 2019 showed disparities that were not explainable by race-neutral factors."  ECF No. 1 ¶ 79.  Whether the Robb Report in fact supports Defendants' or Plaintiffs' position is not a question that the court can resolve at the motion-to-dismiss stage—especially given that doing so would require the court to look beyond the pleadings.  *See Tolton*, 2020 WL 2542129, at *26 ("[A]t the pleading stage courts do not generally scrutinize causation claims or evaluate the degree to which other variables might be responsible for an observed disparate effect.").  The court will allow the disparate impact claim to proceed.

#### B.  Market Facilitation Program Claim (Count II)

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171 (2013).  "A lawsuit becomes moot—and is therefore no longer a 'Case' or 'Controversy'—'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin*, 568 U.S. at 172).  A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin*, 568 U.S. at 172 (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)).

Defendants argue that Count II is moot because the MFP expired several years before this case was filed.  ECF No. 31-1, at 10.  Plaintiffs do not dispute that the MFP has expired: its enrollment period closed on December 20, 2019, and the USDA issued its final round of direct payments on February 3, 2020.  *Id.* at 4; *see* ECF No. 33, at 18.  "[E]xpiration of a government policy ordinarily moots a challenge to it," unless an exception to mootness applies.  *Safari Club Int'l v. Jewell*, 842 F.3d 1280 (D.C. Cir. 2016); *see ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) (holding that a challenge becomes moot when a "government regulatory scheme[] [has] expired or been effectively repealed"); *Caldwell v. Caldwell*, 545 F.3d 1126, 1130 (9th Cir. 2008) (holding that a challenge to a National Science Foundation grant was moot where the grant had expired and "no funding has occurred since then or is likely to occur in the future.").  Plaintiffs raise three exceptions to mootness, but the court concludes that none apply here.

First, Plaintiffs argue that the MFP's expiration has not "completely or irrevocably eradicated the effects of the alleged violation."  ECF No. 33, at 19.  Because the MFP has continuing discriminatory effects, Plaintiffs allege that their claims cannot be moot.  *Id.*  Plaintiffs rely primarily on *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal*

*Service*, 64 F.4th 1354 (D.C. Cir. 2023), to support this proposition, but that case is distinguishable because it concerned ongoing government conduct, which is absent here.   The plaintiff in *Zukerman* sought to print a stamp with a political message through a Postal Service program that offered customized postage.   64 F.4th at 1358.   The Postal Service refused, even though it had "accepted other customers' postage designs with obvious political content."   *Id.*   Mr. Zukerman brought a First Amendment challenge alleging viewpoint discrimination.   *Id.*   During the course of litigation, the Postal Service ended the customized postage program.   *See Zukerman v. USPS*, 567 F. Supp. 3d 161, 171 (D.D.C. 2021), *aff'd sub nom. Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354 (D.C. Cir 2023).   However, the Postal Service did not invalidate or recall the political stamps that had been printed through the customized postage program, and the Court thus determined that the case was not moot because the agency "*continues* to officially recognize some outstanding political postage while Zukerman wants for his stamp." *Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1363.   In the Court's view, each offending stamp that continued to circulate, bearing the imprimatur of government approval, was itself a government action.

    That is not the case here.   MFP funding is presumably still circulating through the economy, much like the stamps in *Zukerman*, and to allegedly discriminatory effect: white farmers continue to disproportionately reap the benefits of their MFP direct payments "to the detriment of farmers of color."   ECF No. 1 ¶ 97.   But Plaintiffs allege no corresponding, ongoing *government* action— no analogue to the Postal Service's continued recognition of offending stamps as legitimate

postage.  Thus, any mootness exception that the D.C. Circuit carved out in *Zukerman* does not apply here.[5]

Second, Plaintiffs argue that the voluntary cessation exception to mootness applies.  *See* ECF No. 33, at 21-22; ECF No. 37.  "A party's voluntary cessation of challenged conduct does not moot the challenge unless it is 'absolutely clear' that the challenged conduct will not recur after the litigation."  *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1230 (D.C. Cir. 2023) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017)).  However, "'the voluntary cessation exception to mootness has no play' when the agency did not act 'in order to avoid litigation.'"  *Alaska v. USDA*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (quoting *Am. Bar Ass'n, v. FTC*, 636 F.3d 648 (D.C. Cir. 2011)).  And "[c]ircuit courts have routinely held that the voluntary cessation exception is not invoked when the challenged conduct ends because of an event that was scheduled before the initiation of the litigation."  *ACLU of Mass.*, 705 F.3d at 55; *see Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) ("In every case applying the voluntary cessation doctrine, the decision to stop the disputed activity was made while the litigation was pending.").  Plaintiffs did not file this action until August 2023, more than three years after the MFP expired.  *See* ECF No. 1.  The complaint does not suggest that the USDA ended the MFP to avoid this (or any) litigation, and therefore the voluntary cessation exception does not apply.  *See Alaska*, 17 F.4th at 1229.

---

[5] Plaintiffs also cite to *Cantu v. United States*, 565 F. App'x 7 (D.C. Cir. 2014).  ECF No. 33, at 19.  *Cantu* is squarely about redressability rather than mootness, and regardless, it is distinguishable.  565 F. App'x at 9.  The *Cantu* plaintiffs challenged ongoing government action: the USDA's conduct in administering an administrative claims resolution process.  *Id.*  Thus, plaintiffs' claims were redressable because the district court "could have granted relief by ordering the government not to act toward appellants based on unlawful racial grounds" in administering its claims resolution program.  *Id.*  *Cantu* does not stand for the proposition that a court could order such relief absent ongoing government conduct.

Finally, Plaintiffs argue in passing that their MFP claim is not moot because it is capable of repetition but evades review.  ECF No. 33, at 23 n.8.  "The capable of repetition but evading review exception applies if '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'"  *J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).  Plaintiffs state only that, "[g]iven the egregious history of conduct here, Plaintiffs easily meet that standard."  ECF No. 33, at 23 n.8.  Construed generously, this could be read as an argument that the government's action is capable of repetition.  But still, Plaintiffs have made no argument as to the first prong: how the MFP evades review.  "The party invoking the exception bears the burden to show that both elements are satisfied," and Plaintiffs have not done so here.  *J.T.*, 983 F.3d at 523.

Because the Market Facilitation Program has expired and none of the above exceptions apply, the court will dismiss Count II as moot.

### V.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 31, is hereby **GRANTED** as to Count II, and as to Plaintiff Roddy's 2020 loan denial claim, *see* ECF No. 1 ¶ 107.  Defendants' motion is otherwise **DENIED** as to Count I.  Defendants shall file an answer on or before September 6, 2024.

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: August 23, 2024

25